## BUCKHANON *v.* THE STATE.

1. The third count of the indictment alleged that the defendant did "kill and murder one Robert Willcox by forcibly placing the said Robert Willcox in a body of water, and by forcibly keeping the said Robert Willcox under the said water, with the intent to kill him, the said Robert Willcox, until the said Robert Willcox was then and there drowned as a result thereof." The defendant demurred to this portion of the indictment, on the ground that it was insufficient, " for the reason that it does not state what kind of force was used, nor in what way or manner the said force was used to place deceased in the water, nor what kind of force was used to keep the deceased Robert Willcox under the water until he was drowned," so that defendant could be put on notice what to defend against. *Held,* that the judgment overruling the demurrer was not erroneous.

2. The evidence in regard to venue was circumstantial, but was sufficient to authorize the jury to find that the jurisdiction of the case was in the county of Wheeler.

3. The court charged the jury as follows: " Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." Error is assigned on this charge, on the ground that there was no evidence to warrant a charge on express malice, and that the court, in so charging on express malice, intimated to the jury and expressed an opinion to them that there had been express malice proved in said case. *Held,* that the charge is in the exact language of the Penal Code, and is not subject to the criticism that it was an intimation or expression of opinion.

4. Error is assigned on the following charge to the jury: " If, after you have examined all the evidence in this case, your minds are unsatisfied, unsettled, wavering, and you cannot, viewing the transaction as you do any other ordinary transaction, come to a conclusion beyond a reason-

able doubt that the defendant is guilty, you ought to acquit him; but if the evidence shows beyond a reasonable doubt that the defendant is guilty, it is your duty to convict him." The criticism upon the charge is that "the law in this case is not dependent upon the doctrine alone of reasonable doubt, but is dependent upon the law of circumstantia/ evidence; and the charge places this case on the doctrine alone of reasonable doubt, when the court should have gone further and placed the case on the doctrine. of circumstantial evidence, and charged the jury that before they would be authorized to convict the defendant, that the evidence should exclude all reasonable doubt and every other reasonable hypothesis save that of the guilt of the accused." *Held,* that the charge was not erroneous. "Whether dependent upon positive or circumstantial evidence, the true question in criminal cases is, not whether it be possible that the conclusion at which the testimony points may be false, but whether there is sufficient testimony to satisfy the mind and conscience beyond a reasonable doubt." Penal Code (1910), § 1013; *McNaughton* v. *State,* 136 *Ga.* 600 (2), 612 (71 S. E. 1038). The court fully and correctly charged the law of circumstantial evidence.

5. Error is assigned on the following charge to the jury: "All admissions should be scanned with care and should be received with great caution. An admission uncorroborated by other evidence is not sufficient to justify a conviction. To make an admission admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or the remotest fear of injury." The criticism is that there was no evidence in the case to authorize a charge on that subject, and that an instruction by the court on that subject was an expression of "opinion to the jury, and intimated to them that there had been a confession proved, or an admission, criminal admission in the nature of and synonymous with a confession." *Held*:

(*a*) There was evidence authorizing a charge on the subject of inculpatory statements or admissions.

(*b*) The charge was not subject to the criticism that it amounted to an expression of opinion or an intimation that there had been a confession or admission.

(*c*) The court more than once clearly and fairly submitted to the jury the issue as to whether there had been any admissions. See the next succeeding headnote.

6. Error is assigned on the following charge: "If you find any admissions were made by the defendant, and that such admissions were made voluntarily, without being induced by another by the slightest hope of benefit or the remotest fear of injury, then you would be authorized to consider such admissions as you would any other testimony in the case; but if such admissions were not made voluntarily, or were induced by another by the slightest hope of benefit or the remotest fear of injury, you would not be authorized to consider such admissions as testimony, but should reject the same. If you find any admissions were made by the defendant and that same were made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury, and that the same is corroborated by other evidence in the case, then you may consider same along with the other evidence in determining his guilt or innocence, remembering that an admission is a circumstance which requires the aid of other testimony to authorize a conclusion of guilt, and that an admission alone, uncorroborated by

other evidence, is insufficient to justify a conviction." The criticism is that the principles of law thus stated constitute the law with reference to confessions, and, there being no confession proved, the charge was unwarranted, inapplicable, and misleading to the jury; that it was argumentative, ambiguous, and intimated to the jury that a confession had been made, or that an admission had been made by the defendant in the nature of a confession, which was sufficiently corroborated in the same manner as the law requires confessions to be corroborated, and was sufficient to convict the defendant. *Held*: "Admissions usually refer to civil cases." Penal Code, § 1028. When applied to criminal cases such evidence is usually termed inculpatory statements or incriminatory admissions, and these expressions are frequently used as synonymous, and must have been so understood in the instructions of the court in this case. The fact that the judge, in connection with the incriminatory admissions charged, not only that they should be received with care, but that it must appear that they were freely and voluntarily made, not induced by fear of punishment or hope of reward, was not a defect in the charge of which the defendant can complain, and was in fact favorable to the defendant, as it placed the same restriction upon criminal admissions that the statute requires be placed upon confessions; but it did not imply in any way that the incriminatory admissions were confessions. Consequently the inaccuracy in the charge does not call for the grant of a new trial.

7. Movant complains that the court charged the jury "in reference to what might be termed 'inculpatory admissions of fact,' and erroneously characterized and denominated them as admissions of guilt or a confession which, if corroborated, as provided in the cases of admissions and confessions of guilt, would be sufficient to convict. In other words, the court charged the law fully with reference to confessions, but in said charge denominated confessions as an admission, and substituted the word 'admission' only in charging said law, instead of the word 'confession.'" *Held*, that the charge of the court in these respects, considered in the light of the ruling in the next preceding headnote, will not require the grant of a new trial.

8. Complaint is made that "the court failed to charge the jury in reference to the corpus delicti in said case, this being one of the main contentions of movant in the trial of the case, that the evidence did not show that there had been a homicide or that a person had in fact been killed; nor did he charge the jury the degree of proof necessary to establish the fact that a killing had taken place, or that any one had been murdered. In other words movant contends that under the evidence in the case and position taken by counsel for defendant, that the court should have charged the jury fully with reference to the necessity of establishing by testimony on the part of the State that the dead man was actually killed, and did not die from other causes, before they would be authorized to go further in their deliberations as to who the party was doing the killing, or did the killing in the case." *Held*:

(*a*) The court charged the jury that if the evidence did not prove beyond a reasonable doubt that the defendant "did, by any one or more of the means and in the manner alleged in the indictment, unlawfully kill Robert Wilcox" with malice aforethought, they should return a verdict of not guilty. If the defendant desired an elaboration on the subject of corpus delicti, he should have duly requested the same in writing.

(*b*) The corpus delicti may be proved by circumstantial evidence. as well as by direct evidence. In this case the jury were authorized to find that a homicide had been committed.

9. The evidence was circumstantial, but authorized the jury to find that it was consistent with the hypothesis of guilt, and excluded every reasonable hypothesis other than that of the guilt of the accused.

No. 2694.  AUGUST 12, 1921.

Indictment for murder. Before Judge Eschol Graham. Wheeler superior court. May 31, 1921.

*Stephens & Stephens* and *W. A. Dampier,* for plaintiff in error.

*George M. Napier, attorney-general, M. H. Boyer, solicitor-general, Seward M. Smith, asst. atty.-gen.,* and *W. S. Mann,* contra.

GILBERT, J.  1-7.  The first, second, third, fourth, fifth, sixth, and seventh headnotes do not require elaboration.

8.  In addition to the count charging murder by drowning, there were other counts in the indictment charging murder by shooting, cutting, stabbing, striking with clubs and other blunt instruments to the grand jurors unknown. The indictment alleges that the deceased was killed by J. E. Buckhanon and J. C. Thompson. The former was tried and convicted, and upon the overruling of his motion for a new trial the case was brought to this court for review. Counsel for plaintiff in error insist that the grant of a new trial is required, because the court, without request, omitted to instruct the jury in regard to the degree of proof required to establish the corpus delicti. It is also insisted that the grant of a new trial is required, because the evidence was insufficient to authorize a finding that Robert Willcox was actually killed by any one, as alleged in the bill of indictment, and that he did not die from other cause. The court charged the jury that if the evidence did not prove beyond a reasonable doubt that the defendant " did, by any one or more of the means and in the manner alleged in the indictment, unlawfully kill Robert Willcox " with malice aforethought, they should return a verdict of not guilty.

The court also charged the jury: " One cannot be convicted of the homicide of another when death was brought about by natural causes, or by misfortune or by accident, and should it appear that Robert Willcox is dead, and that he died from natural causes, or that he died by misfortune or accident, or if you have a reasonable doubt that he is dead, or if dead that his death was produced by natural causes, misfortune, or accident, then the defendant should be found not guilty." If the accused had desired an elaboration of the charge

on the subject of corpus delicti, he should have duly requested the same in writing.

In regard to the sufficiency of the evidence to prove the corpus delicti, it must be borne in mind that the jury of the vicinage deemed the evidence sufficient, and their finding has been approved by the trial court. The trial court and jury are in better position than this court to form a clear conception of what are the facts and what is the truth. The evidence in regard to corpus delicti before the trial court was uncontradicted, and to the effect that Robert Willcox, alleged in the indictment to have been killed, was found dead on " Steamboat Bite " Island in the Oconee River in Wheeler County, everything indicating that he had been washed ashore by a freshet. He had been missing about seven weeks, and his body was partly decomposed. He was fully recognized by his clothing and other indicia. He was about nineteen years of age, a splendid specimen of manhood, suffering from no impairment of health, and had experienced no business depression or other trouble so far as known. He had gone into the river swamp to make a record of cross-ties, and thereafter to hunt. The last persons with whom he had been seen were Buckhanon and Thompson, charged with his homicide. His hat, a gun, some shells, hunting-sack, and the book in which he had recorded the number of cross-ties were found covered with straw, a short distance from the river on the outer edge of the swamp and about one mile down stream from where the body was found. It was impossible for him to have followed the bank of the river from this point to where the body was found, because the swamp was impenetrable. The only way of going from the point where his effects were buried to the point where searchers discovered his body was to go about two miles around the outside of the swamp or to go up the stream of the river in a bateau, canoe, or similar water-craft. Subsequently to his disappearance and before his body was found there had been heavy rains and the stream of the river had been greatly swollen. Blood was found on the inside of the bateau used by the defendant Buckhanon and kept at and about the landing on the river near where the hat, gun, etc., were found, and where Willcox had last been seen in life in company with the defendants. Dr. Leroy Napier, a practicing physician since the year 1898, who knew Robert Willcox and who saw him on the afternoon before his disappearance, swore that the deceased had " never been afflicted with paralysis or

anything like that that impaired his limbs." He further testified that when the body was recovered he examined it and found it in a very badly decomposed condition, " the left eye and left cheek and also the flesh on the neck, all the left side, was sloughing, falling away; the left eye was practically gone, there was a little loblolly-mess in the socket, a portion of his cheek had disappeared, exposing the upper and lower jaw underneath. We could not find any evidence of any cuts or punctures on his body; the skin was thick and doughy, pretty well waterlogged. In the condition the flesh was in it is possible there could have been a bullet wound and we overlooked it; we made a pretty thorough examination. So far as we could tell, the bony structure of the head was intact; in fact there was no fracture down to the base; of course the skin was mummified like heavy parchment paper. We did not find any blow on the head. The skull was in such condition we could not tell if there had been a blow on the head, unless it had been sufficient to break the skull; he could have had a blow on the head sufficient to have killed him without fracturing the skull. *In my opinion we found something about the body that indicated he had received a blow about the head, and that was the peculiar position of his right hand.* His left hand was flexed partially, something in this position, while *his right hand was very tightly clinched,* and was back like that [indicating]. *That indicated a blow on the side of his head prior to his death, or some injury to the skull that would produce a hemorrhage inside on the brain tissue;* or at least that was the way I interpreted it. I don't know that that would indicate that he died in agony, but it indicated to me that he received an injury just before his death. His hand at that time was rigid; it had not been changed from the time he was found until I saw it. What we call rigor mortis had never been broken up in that hand or arm; the arm was stiff. I think it was in the same condition it was in when he died, the fingers pulled down tightly and the hand in that position. I do not think that is usual in an ordinary case of death. I think if he had died with both hands clinched in the same condition, they would not have been clinched back in that position; we find that in paralysis; even a living subject will carry his hand like that, does not seem to be able to get it out of that position. I don't know that a lick on the head usually causes paralytic condition; the usual cause of paralysis is a hemorrhage on the brain; a lick would have produced that condition."

On cross-examination there was considerable elaboration of the opinion expressed in the above quotation, but the substance of the entire evidence of Dr. Napier is included in the above quotation.

It is well established that without satisfactory proof of the corpus delicti a conviction for crime cannot stand. *Langston* v. *State,* 151 *Ga.* 388 (106 S. E. 903). In passing on the question of whether the corpus delicti has been proved, all admissions of independent facts and all circumstantial evidence bearing on that question should be considered. *Wilburn* v. *State,* 141 *Ga.* 510 (10), 513 (81 S. E. 444). Whether the corpus delicti was established in this case depends largely on the weight and value of the evidence of Dr. Napier, considered in connection with the fact that the hat, etc., belonging to the deceased, were found a short distance from the river, that blood was found in the bateau, and that the body was found about a mile up stream. It would seem that the inference is justified that the deceased would not himself have buried his personal effects underneath a bed of straw had he planned self-destruction. The force of logic would also drive us to the conclusion that had the deceased thrown himself into the river at or near the point where his effects were buried, his body would have drifted down stream and could not have been found a mile further up the river. It must be remembered that the opinion evidence is that of an expert in respect to the stated facts about which the opinion was expressed. It is proper and desirable that expert testimony should be kept within proper bounds, especially in criminal cases, where the life or liberty of the accused is at stake. It is also true that opinions are entitled to more weight where facts are stated, and not mere opinions or conclusions. The statement of facts is made essential, under the laws of this State, in the case of non-expert witnesses, and the latter cannot testify to opinions or conclusions without stating the facts upon which the same are based. Of an expert witness this is not required, but in the present case the expert witness does state with clearness and precision the facts upon which his opinions were founded. For this reason the opinion is entitled to more weight than would otherwise be the case had he failed to state the facts. " Expert testimony is to be weighed and judged like any other, and the same tests are to be applied thereto. It is not necessarily conclusive or controlling, even when uncontradicted by the testimony of other experts; but its weight and value are to be determined by the jury, who should consider it in connec-

tion with all the other evidence in the case, the means of knowledge of the expert, the reasons which he assigns for his opinions, and the truth or falsity of the facts assumed in the hypothetical questions put to him. However, where witnesses, although experts, describe symptoms and conditions actually observed by them, and their testimony stands unimpeached, it cannot be ignored any more than any other credible evidence in the case can be; and where the subject of discussion is not on the border line between the domains of general and expert knowledge, but concerns a highly specialized art of which a layman can have no knowledge at all, the court and jury necessarily must depend to a great extent on the opinions of qualified experts." 16 C. J. 756, § 1556; 11 Ruling Case Law, p. 586, § 16, p. 611, § 34, and notes; Penal Code (1910), § 1048; Civil Code (1910), § 5876; *Yates* v. *State, 127 Ga.* 813 (4), 816 (56 S. E. 1017, 9 Ann. Cas. 620).

Applying the foregoing principles of law to the evidence, we conclude that the jury were authorized to find that the corpus delicti was established as required by law.

9. In addition to the facts stated in the foregoing division of the opinion, the evidence authorized the jury to find the facts hereinafter stated to be true in reference to the connection of the defendant Buckhanon. On Saturday, the 15th of January, 1921, Buckhanon, who seemed to be a roving fisherman, and also the younger man, Thompson, were fishing at Cheney's Ferry, in Wheeler County, and had been there a little more than two weeks. They were accustomed to spend Saturday night at the residence of J. H. Thompson, an uncle of the defendant Thompson, situated four or five miles away. They both kept clothes at this house. On that night they came to the uncle's house from the direction of the river, and their pants seemed to be a little wet. Buckhanon mentioned that Robert Willcox came into the swamp that day, and said that he left Willcox lying by a fire near an oak, and that Willcox was wet and drunk. The witness Vaughn testified that Buckhanon, Thompson, Willcox, and himself were all drinking, and that they consumed about a quart of whisky. On the commitment trial of Thompson, Buckhanon swore that the whisky was his, and that he and Thompson ran it off the night before. The oak is near a gate leading into the swamp, and at this place the gun, hat, etc., were found covered with straw. This point is also near a shanty sometimes used by Buck-

hanon. At or near this point on this occasion young Robert Willcox was last seen alive with the two defendants by the witness Vaughn. On reaching the home of the uncle, J. H. Thompson, Buckhanon had a conversation with the thirteen-year-old daughter of the former. She testified that he asked her to cut his throat with a razor; that he seemed like there was something the matter with him; he acted funny, did not talk like he always did; that Buckhanon had about twenty gun-shells, the same color as those which he had given John Williams, and that Buckhanon said he bought some of the shells from Mr. Willcox and Mr. Vaughn gave him some [witness Vaughn testified that he loaned Buckhanon the gun, but did not furnish him with any shells]; and that he gave the shells to her brother, who in turn delivered them to the witness, McKay, who exhibited them on the trial to the court and jury. The gun borrowed by Buckhanon from the witness Vaughn was also turned over to the witness McKay. On the next morning, Sunday, January 16th, Buckhanon left this house, taking with him all of his clothing and other effects, including some meat and vegetables, going to the river. This was the first time he had carried all of his effects with him upon leaving. On reaching the river he took his bateau and proceeded down stream. On Sunday night Buckhanon, traveling in his bateau, approached some raftsmen who were also going down the river on drifting timber. One of these raftsmen, George Quinn, testified that Buckhanon offered him whisky; that Buckhanon's face was black, and " you could not tell whether he was a white man or a negro," that he gave Buckhanon a cup of coffee, and when the latter reached his hand over, stretching his arm, " I saw where the black stopped," that Buckhanon " said he was going on below us to Barker's Landing, that he had a fishery down there; he said his name was Cook." Witness saw Buckhanon again on the next day, Monday, further down the river, and spoke to him, but Buckhanon did not reply. Witness said to him, " Last night you were a negro; now you have changed to a white man; you have on a collar and tie." To this Buckhanon made no reply. Another witness on the raft swore that Buckhanon was " black, disguised; I could not tell he was a white man only by his sleeve and his forehead," and that Buckhanon said his name was Cook. J. M. Smith, a witness for the State, testified that on Tuesday, January 18th, he was on the Altamaha River near Gaitor Slide, near the bend of the old river, Ohoopee, White Bluff,

in Appling County; that there he saw Buckhanon going down the river in a bateau; that he talked to him; and that Buckhanon gave his name as " Vaughn ;" that his face was not then blackened; and that Buckhanon sold his bateau for two dollars and a plug of tobacco. Witness carried Buckhanon a mile below Surrency, where Buckhanon got out in the woods. L. W. Hall swore that on Wednesday or Thursday he examined Buckhanon's boat and found bloodstains on the left-hand wall of the boat, like it had been spattered up there; and just opposite the bloodstain on the wall it looked like something had been dragged out of the boat. There was also a small amount of blood on the seat. Suspicion having been directed to Buckhanon after the disappearance of Robert Willcox, a search was made for him, and he was finally located about one mile from Offerman in Pierce County, some seventy-five or eighty miles from Cheney's Ferry in Wheeler County, where Robert Willcox was last seen alive. He was captured at the home of a man named Hall. Three arresting officers, on arriving at this house, enquired for Buckhanon. The house and kitchen were searched, but Buckhanon was not found in either. Finally he was discovered underneath the house; and when he came out his first words were, " God knows I don't know nothing about that poor boy, I don't know where that poor boy is at " — nothing having been said to him about Willcox or as to the cause of the arrest. The prisoner was taken back to Cheney's Ferry; and the gun, hat, etc., belonging to Willcox, having already been found, Buckhanon was asked to point out the place where they had been hidden. He carried the party directly to the place where these things had been found, and showed them how the gun was lying. Another witness testified in substance that Buckhanon said Thompson shot Willcox, and that at another time he explained that he had heard a gunshot and saw something fall in the river, but that his eyesight was bad, and that he could not tell what it was. A. C. Curry, a witness for the State, testified that he was a county policeman, and with another officer had taken Buckhanon and Thompson on the train to jail; that he heard Buckhanon, who was sitting on the seat with Thompson, tell the latter that if he would take on himself the killing of this young man, he would pay his lawyer's fee and also provide for him while he was in the chain-gang, that Buckhanon also said, " You are a young man ; they will not hang you. I am an old man. If you will take it on yourself, I will look out for you." Buckhanon

said also that he could not live more than ten years, and that before he died he would admit it and tell how he did it, and that they would be obliged to turn Thompson loose.

After careful consideration of all the facts and circumstances shown by the evidence, we are satisfied that the jury were authorized to find that the proved facts were not only consistent with the hypothesis of guilt, but were sufficient to exclude every other reasonable hypothesis save that of the guilt of the accused. We have dealt with all of the assignments of error, deeming it only necessary, however, to elaborate upon the principles ruled in the eighth and ninth headnotes. The verdict was supported by evidence, and the judgment of the trial court overruling the motion for a new trial was not erroneous.          *Judgment affirmed.    All the Justices concur.*