## THOMPSON *v.* THE STATE.

1. The evidence authorized the instruction to the jury that if some person other than the accused on trial killed the deceased as charged in the indictment, and if the accused was at the time present aiding and abetting such other person or persons in the commission of the unlawful act, and participating in the criminal intent, she would be guilty of murder; and it was not subject to the exception that the jury were thus permitted to inquire whether or not persons other than the defendants named committed the crime.

2. The evidence authorized the instructions on the law of conspiracy.

3. The instructions were not open to the exceptions that no evidence tended to show a conspiracy, that the court expressed an opinion that there was a conspiracy, and that such instruction does not apply where husband and wife are concerned.

4. The charge of the law of circumstantial evidence was not erroneous for the reasons assigned.

5. The principles embodied in requested instructions being covered in the charge as given to the jury, there was no error in not complying with the requests.

6, 7. It was not error to refuse requests for instructions not adjusted to the facts.

8. On a trial for murder committed in pursuance of a conspiracy to rob, testimony that the deceased was a man who carried a considerable sum of money all the time, and that this was generally known in the community, was not improperly received, there being evidence from which the jury might infer that the accused had knowledge of the fact testified to.

9. Testimony of statements to the witness by one of the alleged conspirators, other than the one on trial, was not improperly received.

10. Refusal of the court to permit a witness to answer a question on cross-examination, because he had already twice answered it, was not error as restrictive of the right of cross-examination.

11. The assignment of error that statements by the court denied the right of thorough and sifting cross-examination and tended to minimize its effect, and suggested to the witness the answer to the question, is not sustained.

12. In view of evidence that a witness generally kept money on his person and in his house, that this was generally known in the neighborhood where the accused resided, and that one of the two men jointly indicted with her went to the home of the witness on the occasion in question, and of evidence from which the jury might infer that all the indictees on this occasion were at or near the house of the witness, and that their purpose was to rob him, the court did not err in permitting him to testify that he always had some money in his house.

13. Testimony relating to sales of cotton by the deceased shortly before he was killed, and to his cashing checks for people who worked at saw-mills, was not incompetent and irrelevant.

14. The exception that the court's questions to a witness, and manner of questioning, tended to impeach his credibility and to intimate to the jury that he was unworthy of belief, is not meritorious.

15. Refusal to exclude testimony referred to in paragraph 9, supra, on the ground that the conversation occurred before any alleged conspiracy, was not error.

16. If it was error to receive testimony that the witness got a gun which one of the two men indicted with the accused said was his, it did not require a new trial.

17. Testimony by the wife of the deceased, *held* admissible as part of res gestæ.

18. The evidence supported the verdict. Two JJ. dissent.

                    No. 6180.  August 16, 1928.

.Murder. Before Judge Pittman. Murray superior court. April 18, 1928.

Clifford Thompson, Eula Elrod Thompson, and Jim Hugh Moss were jointly indicted for the murder of Coleman Osborn. Clifford and Eula Elrod Thompson were husband and wife. `Jim Hugh Moss was a negro. The defendants were separately tried. All three were convicted without recommendation. The convictions of the husband and the negro were affirmed by this court. 166 *Ga.* 512, 517 (143 S. E. 896, 900). The present writ of error is brought to review the judgment overruling the motion of the wife for a new trial. The evidence against her makes this case: Coleman Osborn conducted a country store, and sold gasoline at his home in Murray County. He was shot in his store and died on the night of Friday, August 5, 1927. The attending physician testified he died as the result of a pistol-shot wound, and from the appearence of the wound it was a 38-caliber pistol. The deceased had lived at the place where he was killed for about 14 years. The defendant had lived in this same community all of her life up to six or seven years before the homicide, and during the latter period had frequently visited the community. She was at the store of deceased about two or three weeks before the homicide. She knew and was intimate with the deceased and his wife. The defendant's father lived in the same community, a little over a mile from the home and place of business of the deceased. Clifford Thompson and Jim Hugh Moss had never lived in that community. The deceased was accustomed to keep on hand considerable sums of money. This fact was well known in the community. Sawmills of a certain lumber company had been operating in that community for about two years, and the deceased had cashed about all the checks for the people who worked at both of those mills, about fifty men, including a brother of the defendant, who lived about where his father lived, or near by. The deceased had had about 20 bales of cotton stored in his barn at his home, not over 100 yards from his store. He had this cotton on hand at the time the defendant was at his store about three weeks before his death, but had sold the cotton, or a part of it, about a week before he was killed.

On Tuesday or Wednesday before the deceased was killed on Friday night, this defendant was seen in that neighborhood, in company with her husband and the negro Moss. They were traveling

in a Ford roadster automobile, and the white man was driving. They passed the home of Berry Bennett, who lived about 2 miles from the home of the deceased, about 5 o'clock in the afternoon. They were coming from the direction of the home of defendant's father, and going in the direction of Ramhurst. On the same day this defendant drove past the home of John Glass, who lives three miles west of Ramhurst and seven miles south of Chatsworth. She was in a Ford roadster automobile in company with a white man and a negro, the latter sitting on the right side of the car. The car passed close enough to the witness, who was at his hog-pen by the side of the road, for him to have touched the negro with his hand as he passed. On Wednesday, August 3, 1927, Paul Cagle and one McClure left Etowah, Tennessee, about 3:30 or 4 o'clock in the afternoon, traveling to Georgia in an automobile. Cagle was acquainted with Clifford and Eula Thompson, and with Jim Hugh Moss. Before reaching Ocoee, Cagle heard a noise that caused him to think he had tire trouble. He pulled his car out to the side of the road, and at this point the defendant, her husband, and Moss drove by him in a Ford roadster automobile. He investigated and found he had no tire trouble. His attention had been attracted by the firing of what he took to be a pistol, which the woman had. Two shots were fired. As he looked back when he first heard the noise, these three persons in the Ford roadster were getting close to him, and he saw the smoke. He looked back, and they fired a second shot. What he took to be a pistol at that time was on the outside of the car. He was perhaps 20 or 30 feet or a little more from them. This was between Benton and Ocoee. Cagle drove on, and repassed the defendant and the two men in the Ford roadster before reaching Ocoee. The defendant was sitting between her husband and the negro in the car. Cagle pulled up at Ocoee and stopped, and the defendant and the two men drove up to a little store there, and stopped. Cagle and McClure drove away from Ocoee behind the defendant and the two men, but passed them about two miles south of that place, after which the defendant and the two men in the Ford roadster followed just behind them all the way to Tennga, except as they went around a few curves. At Tennga, Cagle and McClure crossed the bridge, and the defendant and the two men in the Ford roadster turned down the road to the right at the State line. That was in Georgia, about 5 o'clock

in the afternoon. The defendant was seen by Colvard Cox at his garage at Tennga on Thursday of the week the deceased was killed. His garage is located just north of the forks of the road leading towards Chatsworth and the one leading towards Shumake, the latter being the right-hand road. The left-hand road crossed the overhead railroad bridge. The defendant was traveling in a Ford roadster automobile with a white man and a negro, the white man driving. They took the right-hand road towards Shumake.

Bill Kirby operates a general merchandise store at Shumake. On August 3d or 4th, of the week that the deceased was killed, Kirby saw the defendant, Jim Hugh Moss, and a white man, in a Ford roadster automobile in front of his store, about 6 o'clock in the afternoon. Moss came into the store and bought a box of "Sure Tight" tire patching, and something to eat. Kirby as a witness identified a box of tire patching exhibited to him as the one he sold to Moss, bearing thereon his mark put there by the witness himself. The defendant and the two men were headed south from this point, in the direction of Spring Place, about 8 or 9 miles distant. This was on Wednesday or Thursday. The defendant was identified by one Dixon as the woman he had seen at Kirby's store about 5 or 6 o'clock in the afternoon of Wednesday or Thursday afternoon in the week in which the deceased was killed. She was traveling in a Ford roadster automobile with Clifford Thompson and Jim Hugh Moss. Dixon spoke to Moss as the latter came down off of the store steps to enter the car, and told him he had a flat tire, but he got in the car and drove away, going south. Later Dixon passed these persons where they had stopped their car by the side of the road to fix their casing. He identified Clifford Thompson and Jim Hugh Moss as the two men in the car with the defendant.

S. J. Maples is a merchant and lives at Etowah, Tennessee. Knows the defendant and Jim Hugh Moss, but does not know Clifford Thompson. He identified the defendant. On the day of the night on which the deceased was killed he saw the defendant and Moss; saw him five or six times. They were together, traveling in a Ford roadster automobile, this defendant and Jim Hugh Moss. Moss came in his store, and the other two, the defendant and her husband, sat in the car. They came to the store about sundown. Maples knew Moss well; Moss traded with him all the time. Moss

asked him what kind of a gun he had. He told him he had a 45 automatic. Moss asked him if he would swap guns with him. Moss said he had a 32 or 38 caliber, Maples could not understand which, as Moss was stuttering. He asked Moss what he wanted with it. Moss said he wanted to take a trip. He said to Maples, "How about taking me to Georgia to-night?" Maples said, "I can't go down there." Moss said, "I will give you twenty-five dollars to take me to Georgia." Maples said, "Why don't you go in that car you are in?" Moss replied, "I don't want that woman to know I am going. I want you to take me and follow them down there and bring me back before daylight." Moss inquired as to the price of flour when he came into the store door, but did not purchase any.

The defendant, her husband, and Jim Hugh Moss were at the store of one Warlick, at Etowah, about 7 o'clock p. m. of the night on which the deceased was killed. They came to the store in a road-ster car. Moss pretended he wanted a pair of shoes, but did not get them. They left the store a few minutes after 7 o'clock, travel-ing the road leading south, in the direction of Benton, Tennessee, and Georgia. The most direct route to East Etowah would be by 5th street. All three left the store in the car, and were going away from that street. Between seven and eight o'clock on the night of the homicide, Clifford Thompson passed the home of Ralph Burris, about 2-1/2 miles north of Benton and 12 or 13 miles south of Etowah, Tenn. He was going in the direction of Georgia. It would take 20 or 25 minutes to drive from Etowah to Benton. He was traveling in a Ford roadster, '26 model. He was driving the car, his wife was sitting in the middle, and the negro on the other side. On the night of the homicide Dr. George Keith was at his father's home in Georgia. He and his wife returned from his father's home to their home in Etowah, Tennessee, that night, in a car driven by Jim Lowry. Left his father's about 9 o'clock. Passed the home of Mont Howell about 9:10 or 9:15. Saw a Ford roadster standing near Howell's, on the side of the road, headed south. No one was in it. From Etowah to Howell's is about 36 miles. At that time, in the condition of the roads, it would take about an hour to drive that distance. This car had a Tennessee license tag on it. The witness Jim Lowry testified that the Ford roadster was parked on the side of the road just across the railroad from Mont Howell's house, a distance of 50 or 75 feet, he did not

know whether a hundred yards or not. The bottom of the windshield on that car, on the left-hand side, was cracked. Clifford Thompson had several cars; about that time he had a Ford roadster. Lowry drove that roadster before Thompson got it from Jim Owensby. Lowry worked for Jim Howell, and Owensby bought it from Howell; and Lowry was working for him when he bought. When Lowry next saw Thompson's car its windshield was broken in the same way as the car that was sitting in front of Mont Howell's.

Some time prior to the August term, 1927, of Murray superior court, O. E. Rutter and Jim Lowry brought a Ford roadster automobile from Etowah, Tennessee, to Chatsworth, and placed it in Graves' garage. During that term Rutter took a tire off the left rear wheel of that car and brought it into court. This casing was on the car when Rutter and Lowry left Etowah with it, and was introduced in evidence on the former trial of the case. On Monday after the homicide J. R. True and E. J. Carver were working on True's barn, by the side of the road, at a point about 7 miles outside of Etowah. These men saw Clifford and Eula Thompson and Moss pass True's barn about 2 o'clock in the afternoon. They knew Moss. They were in a Ford roadster, and the white man was driving. The defendant was sitting between the white man and the negro. They were coming from the direction of Chatsworth and going in the direction of Etowah. Heard of their arrest about two hours after they passed them at this point.

At the time of this homicide Mont Howell lived in the upper edge of Murray County, about 11 or 12 miles from Chatsworth, and a little north of the crossing of the dirt road over the railroad. Howell saw two sets of men's tracks at that point on Wednesday night. On the night of the homicide some one came to Howell's house, and wanted something to eat. Howell told him he could not give it to him, and said, "You ought to have stopped before night, and not be disturbing people this time of night." He replied that he had been working all day, and was hungry. Howell said, "That is all the more reason you ought to have stopped before night and not be disturbing people in the night." He came in the house. When Howell slipped out on the porch he was on the upper end of the porch where Mrs. Howell was sleeping, and he stepped off of the porch and came around some vines in front of Howell, and

was getting closer to Howell, when Howell made him get off of his yard with his gun. After that he heard a car starting down at the road, about 75 yards from the house; he could not tell which way it went. The next morning Howell noticed tracks around there, two men's tracks and a woman's track. He followed these tracks on down to the edge of the Federal road. Just one track went from his porch down to the road, but when he got down there, there were two more tracks, a man's track and a woman's track. The track that went out of Howell's yard was a well-shaped, nice shoe track. The other man's track was that of a worn-out shoe. The woman's track was a nice little track. The worn out shoes did not seem to have any heels on them. Jim Hugh Moss was brought to Howell's house after he was arrested. Howell saw his foot and shoe; took a good look at his shoes, and it looked to him they were the shoes that made the tracks, or else another pair just exactly like them. Saw the shoes placed in the track. The shoe fitted the track just as nicely as it could fit. When Howell went down to the Federal road there were three tracks in a sandy place in the gully. At the place on the road where they switched the car, the woman stepped out of the car into another sandy place. The tracks of this woman were the same as those above referred to. It was about 9 o'clock Friday night when the party came to Howell's home. Mrs. R. E. Petty lived about half a mile south of Mont Howell's. A man came to her house on the night the deceased was killed, between 9 and 10 o'clock. He asked for something to eat. She told him they did not have very much left from supper. She got and handed him a lunch. He took it and said he did not have any money to pay her. He said she would have to do something. He drew a gun and flashed a light in her face. She tried to hook the screen door, and he pulled it back from her to get in. She backed away, and told him not to come in. She went into her mother's room and screamed and called Mr. Plemons, a neighbor, who answered her and came to her rescue. The man then went away. She heard a car go by after he left. It seemed to be picking up a right smart little speed as it passed by. She saw this man, and has seen him since. She identified Jim Hugh Moss as the man who came to her home. Eula Elrod Thompson used to live about a mile from Mrs. Petty's home.

Miss Minnie Adams, who had known the defendant for 10 years,

testified that on the night the deceased was killed the defendant
was at Smyrna church. This church is something like three miles
from the home of the deceased. The defendant came in a car to
the door of the church. She and a white man came in the church.
She seemed to be looking for somebody. They went out of the
church, and then came back in. They left the church a short while
afterwards. That was near 10 o'clock. On the night of the hom-
icide three boys, Anderson, Hampton, and Hicks, left the home of
Sam Jackson, about 2-½ miles north of Chatsworth, about 9:30
or 10 o'clock, to return to Chatsworth. Two of the boys had guitars.
Near Mr. Messer's home, and near the railroad crossing north of
Chatsworth, a Ford roadster passed them. It did not have any tail
light. When they got down to the railroad there was a car parked
on the Chatsworth side of the railroad. It was headed towards
Chatsworth. These boys were held up there; some one standing on
the railroad-tracks threw a light in their faces and told them to
throw up their hands. He made them turn their pockets inside
out, but they didn't have any money. He took their guitars away
from them, and told them to "beat it," which they did. No other
car had passed them, headed towards Chatsworth after the Ford
roadster passed them. The man that held them up came from the
direction of that car parked there, and went back to the car. A
shot was fired there. That car started up and left. It was a Ford
car. They went back to the place of the hold-up the next morn-
ing and saw where the car had been parked and skotched. The
tire of the left rear wheel had a "TVY" tread. The other tires
were Goodyear tires with diamond tread. They later saw a Ford
roadster in Gregory's garage, which was pointed out as being Cliff
Thompson's car. The tread on the tires of that automobile com-
pared with the tread on the tires on the car that was parked at
the scene of the holdup, and the tires were arranged in the same
manner.

Mark Parrott lived about 1-½ miles from Chatsworth. On the
night of the homicide he heard a shot fired down in the direction
of the railroad, somewhere about 10 o'clock. Saw a Ford roadster
automobile pass his house a few minutes before this shooting. Went
down to the crossing right after that and found a pistol shell, right
this side of the crossing on the Chatsworth side, along the road. It
was a 38 special, Peters brand shell, which he marked and turned

over to Mr. Steed. He identified a shell exhibited to him on the
witness stand as being the shell which he testified he found at the
railroad crossing. It had been fired just like it now appears. On
the morning after the homicide, four empty pistol shells were
found in front of the store of the deceased. They were 38 special,
Peters brand shells. They looked like they had been recently fired.
These shells were marked and turned over to Mr. Steed and Mr.
Butler. Paul Brindle as a witness identified four shells exhibited
to him, as being the four shells which he had so marked and turned
over to parties above mentioned. Several witnesses, on the morn-
ing after the homicide, observed the tracks made by an automobile
and leading from Center Hill schoolhouse; observed them at the
scene of the hold-up at the railroad crossing; also saw those tracks
at Spafford's cross-roads, where they came out from Spring Place
and turned out to Center Hill; and tracked them ¼ of a mile
south of Center Hill as far as Mr. Rich's home. One of the tires
making that track had a "T V and Y" tread on it. That was on
the left rear wheel. The other three tires were Goodyear diamond
casings. These witnesses saw a Ford roadster automobile in Greg-
ory's garage, pointed out to them as Cliff Thompson's car. It had
three diamond Goodyear cord tires on it, and the left rear wheel
had a tire with a "TVY" tread on it. That was the same as the
track of the car testified to above, as observed by these witnesses.
Paul Brindle heard of the death of the deceased about 2 o'clock
a. m. on the night he was killed, and went to the home of the de-
ceased. A gasoline can was on the store porch, with gasoline in it.
He saw tracks around the store, leading west from the store up
towards Center Hill schoolhouse. There were two different tracks
of people leading from the store. One track had a heel on the
shoe; the other one had no heel, and was broken in two. Both
tracks led towards the schoolhouse; they were fresh tracks. The
steps were about six feet apart. They were made by a person run-
ning. They began about ten feet from the store; there were some
kind of ruts cut up there, and they had hit them on the east side
of them and run across and made another track on the west side.
The tracks were in the mud there at the store, that is, the one de-
scribed as the shoe broken in two. One shoe looked to be larger
than the other; the one with no heel looked to be larger than the
one with the heel on it. Witness did not see any tracks in stocking

feet. One of the tracks seemed to be made by about a six and a half shoe. The persons who made those tracks were not walking.

Lis Rich lived about ¼ of a mile from the deceased. Heard the shooting that night, between 11 and 12 o'clock. Six shots were fired, close together. He went down to the store of the deceased, who was lying dead behind the counter. About five minutes after the shooting witness heard a car start. It sounded as if it started from the forks of the road at Center Hill, about 200 yards or more from the store. Heard it pass his house; it was going tolerably fast. It ran like a Ford, as well as he could tell. Three $1 bills were lying on the counter in the store, and two $1 bills on the floor. J. B. Butler testified that the defendant and her husband were arrested at Etowah on Monday afternoon. He went to Etowah Saturday afternoon, and did not find them until Monday. Saw the car which Cliff Thompson had when he was arrested. It was a Ford roadster. One tire on that car had a "TVY" tread on it, and there were two or three Goodyears. One of the latter was considerably worn, and it was hard to tell what it was. It had this casing (indicating) on a rear wheel; didn't remember which wheel. Witness identified a pistol which the deputy sheriff got in the room, and which Cliff Thompson admitted was his. It had certain cross marks on the handle. It was a 38-caliber special, Smith & Wesson pistol. It was loaded with Peters shells, long-range special, 38 caliber. When Cliff Thompson, Eula Elrod Thompson, and Jim Hugh Moss were arrested they were turned over to this witness. Immediately afterward Eula Thompson asked the witness to carry her over in town to see a lawyer before they left; she said they had a lawyer employed, and wanted to go by and see the lawyer. He was present sometime before the August term of court when some shells were fired from the pistol that Cliff Thompson admitted was his. Witness saw the car that was brought down as Cliff Thompson's car. It was the same car Cliff Thompson had when arrested, and equipped with the same kind of tires as it was up at Etowah. The defendant was arrested about 3 or 4 o'clock in the afternoon, at her home.

B. E. Biggs was chief of police at Etowah, Tennessee. Learned on Saturday that Mr. Osborn had been killed in Murray County. Was informed of the parties that were suspected, and began to look for them. They were arrested on the following Monday. He got a

box of tire patching out of the car of Cliff Thompson, and marked the same. He identified a tube of tire patching exhibited to him on the stand, as the box of patching he got out of this automobile, marked with the marks he had placed upon it. The pistol of the deceased was a 32 long. After the killing it indicated it had been shot one time. The empty shell was lying on the mantel. Expert evidence was introduced, tending to prove that marks made by the plunger, on the same make of shells, shot from different pistols of the same caliber and make, are different, while those fired from the same pistol are marked exactly alike. An experiment was made by which Peters brand cartridges were fired in the pistol of Cliff Thompson, and an expert testified that the marks made upon these shells were the same as the marks on the shells found near the store porch of the deceased, and on that found near the railroad crossing above referred to. The same brand of shell was fired from four other pistols of the same caliber and make as that of Cliff Thompson's pistol, and an expert testified that the marks on these shells were different from the marks on the shells fired from Cliff Thompson's pistol. The pistol shells found in front of the store of the deceased, and that found at the railroad crossing, and the shells fired in the above experiments, were introduced in evidence, as was the pistol identified as that of Cliff Thompson. One box of "Sure Tight" automobile tire patching, identified by the witness Kirby as having been sold to Jim Hugh Moss at a time when the defendant and her husband were present in a car in front of Kirby's store at Shumake, in Murray County, on Wednesday afternoon prior to the homicide, and identified by the witness Briggs as taken from the automobile of Cliff Thompson, in Etowah, Tennessee, at the time of his arrest, was introduced in evidence. An automobile casing, Premier balloon, "TVY" tread, identified by the witness Rutter and by Jim Lowry as having been taken from the left rear wheel of the Ford roadster automobile of Cliff Thompson, was introduced in evidence.

On the night of the homicide, about 11 or 12 o'clock, some one came to the front porch of the residence of the deceased, knocked three or four times, and called hello, in a very low voice, several times. The deceased was asleep. His wife was awake. She got up, went to the window, and asked what was wanted. The person, calling for the deceased, replied that he wanted to get some gas, that

49

his car was up the road about ¼ of a mile, that he had his family with him from Dalton, and had run out of gas. She then called the deceased to get up. She did not have to wake him. The first words the deceased spoke to his wife were, "That is the same white man and negro that was here the other night," which was Wednesday night. They were there on Wednesday night. The deceased got up and talked to the man at the window, a few words. He picked up his clothes, went to putting them on, told his wife to get his gun, and turned on the light in their room. She went to the other room, and on coming back to the room where the deceased was dressing she held the gun until he put his shoes on. She gave him the gun and he walked out the door of the dining-room, facing the store. She heard him drawing gasoline in a can that he used to draw gas for people who did not have anything to put it in. A little bit after he drew the gas two shots were fired, when the deceased hollered, "You" something, that she did not understand. Then another shot was fired, a different gun. Then four shots were fired. In a few minutes a car started from up about the crossroads. It sounded like a Ford car. The can in which the gasoline was drawn was left at the store. The voice that called the deceased that night was a very low, soft voice of a man. She has heard the voice of the person that called the deceased out that night, again since that time. That was at Dalton, in jail. She immediately recognized that voice; it was Cliff Thompson's voice. It was in the dark where she could not see either one, and she could tell his voice when he spoke. She recognized him by his voice as being the same man. Mr. Mitchell was there at the time, standing by the side of the cell, and she could recognize his voice as he talked there. She did not see Cliff Thompson there in the jail; she knew it was he talking, it was his voice, the same man that was at her home. J. C. Mitchell testified that he talked there to Cliff Thompson in the jail when Mrs. Osborn heard the conversation she testified about. Cliff Thompson made a statement to the witness relative to his car and his pistol. He further testified that the Ford roadster he pointed out to the witnesses was the car procured in Etowah, Tennessee, and driven from that place to Chatsworth by O. E. Rutter and Jim Lowry.

The defendant introduced expert evidence tending to show that the marks made by the plunger on cartridges of the same brand,

when shot from the same pistol, are not always alike. Jim Owens testified that he knew the defendant well; that he was at Smyrna church the night the deceased is alleged to have been killed, and he did not see the defendant there that night. Other witnesses who attended this church that night testified to the same effect. Dave Green testified that the defendant was at her home in Etowah, on Friday night, August 5, 1927, about 12:30 o'clock. M. J. Spurling testified that he saw the defendant and her husband at their home on the night the deceased is alleged to have been killed, a little after 9 o'clock. He went there to get some ice for a sick brother in law, and got some from Cliff Thompson. N. W. Puckett testified that he went to defendant's home every night of the week the deceased was killed, to deliver milk. Saw Cliff Thompson there on the night the deceased is said to have been killed. He would always come and get the milk and put it in the ice box. The witness went to work at 11 o'clock at night, and quit at 7 o'clock in the morning. He testified that, independently of his book showing the delivery of milk, he did not know whether they were there a single night. A. M. Thompson, the father of Cliff Thompson, testified he lives about 20 miles from the center of Etowah. The last time he saw his son and the defendant at his home was on Sunday before they were arrested on Monday. They came in during the time they were eating dinner on that day. Asked them to come in and eat dinner and they said, no, they got their dinner before they left Etowah. The defendant and her husband remained at his house that afternoon until supper time, when they had supper, and then they went back to Spring Town to night meeting. Defendant and her husband then came back to his place, stayed a few minutes, and left for their home.

The defendant made a statement in which she denied guilt, and stated she had not been in Georgia since July 27; that before that time she was down here very often. She knew the deceased well; he and his wife were special friends of hers. She traded with them. She had not heard anything about the killing until she was arrested at her home in Etowah on Monday, August 8.

For the State in rebuttal, Charlie Davis testified he lived about 4 miles below Chatsworth, and about 1-½ miles from where the deceased was killed; and that the defendant's father lived about the same distance from there. He lived near the defendant's father at

that time. He had an interest in some cotton, with Mr. Osborn; and just a short time before he was killed some of this cotton was sold, about a week or ten days before the killing. He knew the defendant, and saw her, during the week the deceased was killed, at her father's home. Thompson was with her. He saw her about the middle of the same week. He had been to church and come back. The witness sold six bales of cotton that he testified about, and he got one half of it. He was at Smyrna church that Friday night, and went home by foot, a distance of 2-½ miles, reaching there about 11:30. Left before the services broke. Did not see the defendant there.

Allen Baggett lived about 5 miles below Chatsworth, and about ½ mile north of the home of defendant's father. Knows the defendant. Saw the defendant on Wednesday of the week that the deceased was killed; she passed his house, going towards her father's. She was traveling in a Ford roadster, and a white man and a negro were with her, the white man driving. That was between 12 and 1 o'clock. He was standing in his lot gate, and saw them pass in the road, perhaps ten feet from him.

The grounds of the motion for new trial appear in the opinion.

*L. T. Mann, W. E. Mann, W. G. Mann,* and *Tom Taylor,* for plaintiff in error.

*George M. Napier, attorney-general, John C. Mitchell, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

HINES, J. 1. The court charged the jury as follows: "If you find from all of the evidence in this case that some person other than the defendant killed Coleman Osborn, as charged in the bill of indictment, and that this defendant, Eula Elrod Thompson, was present at the time aiding and abetting such other person or persons in the commission of his or their unlawful act, and participating in his or their criminal intent, the defendant, Eula Elrod Thompson, would be guilty of murder and you ought to so find." The defendant excepts to this charge, upon the grounds, (a) that there is no evidence on which to base the same, and (b) that the indictment charged that Clifford Thompson, Jim Hugh Moss, and Eula Elrod Thompson committed the offense, and that by the use of the language, "any other person or persons," the court turned the jury loose to inquire whether or not others besides the defendants named committed the crime. We hold that the evidence au-

thorized the instruction, and that the second ground of objection to it is without merit. *Thompson* v. *State,* 166 *Ga.* 512 (143 S. E. 896).

2. In three grounds of the motion for new trial the defendant excepts to certain instructions to the jury, touching the law of conspiracy, not upon the ground that they do not state correct principles of law, but upon the ground that there is no evidence upon which to base them. The evidence authorized these instructions.

3. The court charged the jury as follows:  "If a conspiracy to rob Coleman Osborn is shown by the evidence in this case, and it is shown that the defendant was a party to such conspiracy, and had not withdrawn from such conspiracy prior to the time that Osborn was killed; and that one of her co-conspirators killed Osborn while attempting to carry out the original purpose of the conspiracy, the defendant would be guilty of murder, although she may not have been in actual presence at the scene of the killing, and although she may not have had any intention to kill and murder Coleman Osborn." The defendant excepts to this charge, on the grounds, (a) that there was no evidence tending to show a conspiracy between any of the defendants; (b) that the instruction expressed an opinion that there was a conspiracy; (c) that such instruction does not apply where husband and wife are concerned, as in this case. These exceptions are without merit.

4. The defendant insists that the trial judge erred, after charging the jury as follows: "In so far as the State relies for conviction in this case on circumstantial evidence, it should be sufficient to exclude, not every possible theory, but every reasonable theory save that of the guilt of the accused. It should be consistent with her guilt and inconsistent with her innocence," in charging, in immediate connection, as follows: "I charge you that, whether dependent upon positive or circumstantial evidence, the true question in criminal cases is, not whether it be possible that the conclusion at which the testimony points may be false, but whether there is sufficient testimony to satisfy the mind and conscience beyond a reasonable doubt." The assignments of error are, (a) that the giving of the latter instruction in immediate connection with the preceding one destroyed the true rule in regard to circumstantial evidence, confused the minds of the jury, and tended to wipe out the

distinction between positive and circumstantial evidence; and (b) that the first instruction given left the jury to infer that there was other evidence in the case besides circumstantial evidence, and that the court should have instructed the jury that this was a case depending entirely upon circumstantial evidence. The court did not err in giving in charge to the jury section 1013 of the Penal Code, after having instructed them as to the sufficiency of circumstantial evidence to authorize a conviction. *Johnson* v. *State,* 128 *Ga.* 71 (57 S. E. 84) ; *Buckhanon* v. *State,* 151 *Ga.* 827 (4) (108 S. E. 209). Where the court defines direct and circumstantial evidence and gives to the jury the rule governing the sufficiency of circumstantial evidence to authorize conviction, the omission of the court to instruct in so many words that the defendant's guilt is sought to be established only by circumstantial evidence is not sufficient ground for new trial. *Owens* v. *State,* 139 *Ga.* 92 (76 S. E. 860). This instruction did not leave the jury to infer that there was other evidence in the case besides circumstantial evdence. *Thompson* v. *State,* supra.

5. The court was requested to give to the jury the following instructions: (a) "I charge you that if the defendant remained in a car at the schoolhouse, and either Thompson or Moss or both of them went to the store or home of Coleman Osborn, and although their purpose may have been to rob Osborn and in so doing killed him, this defendant would not be guilty unless she was aiding and abetting them and participating in their criminal intent." (b) "If Cliff Thompson and Jim Hugh Moss or either of them went to the house of Coleman Osborn or to his store for the apparent purpose of getting gasoline, and in doing so a quarrel ensued, and the said Thompson and Moss or either of them shot and killed said Osborn, and the defendant was not present, aiding and abetting them in their criminal intent, she would not be guilty and you should so find." In two grounds of the motion for new trial the defendant alleges that the requested instructions were pertinent, were not covered by the charge as given, and that the court erred in refusing them. The principles embodied in these requests were covered by the following instructions given in the court's charge: "To abet another to commit a crime is to command, procure, or counsel him to do it, and presence, actual or constructive, and participation, are necessary to constitute one an abettor. I charge you, therefore, that

where one is present where a crime is committed but does not assist in its commission, nor share in the criminal intent, he or she could not be convicted as a principal in the second degree or as a principal in the first degree. I charge you that in order to convict the defendant as a principal in the first degree or principal in the second degree, she must not only be present, actually or constructively when the crime is committed, if one is committed, but must aid and abet the actual perpetrator of the crime."

6. The defendant requested the court to give to the jury this instruction: "That if it is found that there was no conspiracy entered into between the defendant and any other of the codefendants, and if the jury further finds that the defendant did not fire the fatal shot that caused the death of the deceased, Coleman Osborn, but if they find from the evidence that the defendant was present at the time of the killing, aiding and abetting, in order to find her guilty the jury would have to find that she not only consented and concurred in the perpetration of the act of killing, but also that she had a felonious design upon the person of the deceased, or participated in the felonious design of the person who killed the deceased; that mere presence and participation in the general transaction in which a homicide is committed is not conclusive evidence of a concurrent design with the person killing." The defendant alleges that the court erred in refusing this instruction, because it was pertinent, was not covered by the general charge, and should have specially been given, as the court had charged the contentions of the State on the question of conspiracy, and the defendant's connection therewith.

Where three persons conspire to rob a merchant in his store, and one of them is not actually but is constructively present aiding and abetting the robbery, and the other two enter the store, and, in furtherance of a common design to rob, kill the person intended to be robbed, such killing is the probable consequence of the unlawful design to rob, and all the conspirators are guilty of murder, including the one who is only constructively present aiding and abetting the robbery. It is not necessary that the crime of murder should be a part of the original design to rob; but it is enough if it be one of the incidental probable consequences of the execution of the design to rob, which should appear at the moment to one or more of the participants to be expedient for the common purpose.

In such circumstances the intent of the actual slayer is imputable to his co-conspirators. *Berryhill* v. *State,* 151 *Ga.* 416 (107 S. E. 158); *Gore* v. *State,* 162 *Ga.* 267 (134 S. E. 36). In view of the above ruling, the requested instruction was not correctly adjusted to the facts of the case, and the trial judge did not err in refusing it.

7. The defendant requested the court to give to the jury the following instruction: "I charge you further, that even if you believe from the evidence beyond a reasonable doubt that the defendant was present at the time of the commission of the crime, if one was committed, this would not authorize you to convict her, unless the evidence showed beyond a reasonable doubt that she assisted in the commission of the crime of killing of Coleman Osborn or shared in the criminal intent of the actual perpetrator of the crime; and unless the evidence shows these things, you should acquit the defendant." The defendant insists that this charge was pertinent, and that the court erred in refusing to give it. The court did not err in so refusing, for the reason we have given in dealing with the refusal of the requested instruction set forth in the paragraph next preceding.

8. Berry Bennett, a witness for the State, testified that the deceased "was a man that carried a considerable sum of money all the time; he carried some money;" and that this "fact was generally known in the community." The defendant objected to the admission of this testimony, on the ground that there was nothing in the evidence to show that she or the other defendants jointly indicted with her had any knowledge of this fact. The objection was overruled. The court did not err in admitting this testimony. There was evidence from which the jury might draw the inference that the defendants had knowledge of the fact that the deceased was accustomed to keep on hand considerable money.

9. S. J. Maples, a witness for the State, testified as follows: "Jim Hugh Moss asked me what kind of a gun I had. I said 45 automatic. He asked me if I would swap with him for his gun; he said he had a gun. I don't know whether it was a thirty-two or thirty-eight he said; he was stuttering, and I could not understand very plain whether it was a thirty-two or thirty-eight, what caliber it was. I said, 'What do you want with it?' He said he wanted to take a trip; he said, 'How about taking me to Georgia to-night?' I said, 'I can't go down there;' and he says, 'I will give you twenty-

five dollars to take me to Georgia.' I said, 'Why don't you go in the car you are in out there?' He says, 'I don't want that woman to know I am going.' He says, 'I want you to take me and follow them down there and bring me back before daylight, follow them down there and bring me back; to follow Cliff and the woman down there.' He never said whereabouts in Georgia, just said Georgia." The defendant objected to the admission of this testimony, on the ground that it was hearsay, immaterial, and irrelevant. It was received over the objection. After the fact of conspiracy is proved, the declarations of any one of the conspirators during the pendency of the criminal project are admissible against all. Penal Code, § 1025. Declarations which form part of a chain of connected facts, connecting the prisoner with the crime, are admissible, though not made in his presence or during the pendency of the criminal project. *Jones* v. *State,* 63 *Ga.* 395. Applying these principles, the court did not err in admitting this evidence.

10. S. J. Maples, a witness for the State, testified that Burkett Ivens gave him a subpœna requiring him to attend this trial; that he came on the same train with Ivens to attend the trial; that he stayed at the hotel the night before; that his bill had not been paid, but that he expected to pay it himself. After the witness so testified counsel for the defendant asked him if he had paid his railroad fare. The trial judge remarked that he did not see the materiality of the question, as it was the duty of the State to pay the fare of a non-resident witness. Counsel for the defendant stated that he had a right to show that Ivens, who had testified as a witness for the State, was taking an interest in it by bringing witnesses to the trial at his own expense. The solicitor-general stated that Ivens did not bring Maples to court at his own expense. The judge repeated his statement that he did not see the materiality of this evidence, for the reason before given by him. Counsel for the defendant then said: "I understand the law; but if anybody else does it, we have the right"— when the judge broke in and stated that the witness had answered the question twice, and that one time was enough. The defendant assigns error upon the above statements and action of the trial judge, upon the grounds, (a) that it restricted the right of the accused to a thorough and sifting cross-examination of this witness; (b) that it minimized the effect and weight of the evidence that the railroad fare of the witness was

paid by Ivens, which was a question for the jury alone; (c) even if there had been any law authorizing the State to pay the transportation and fees of witnesses, it was clearly the right of counsel for the defendant to find out who was paying them; and (d) that the above action of the court was harmful and reversible error. The refusal of the court to permit the witness to answer this question, based upon the fact that the witness had already answered it twice, was not erroneous for any of the reasons assigned.

11.   Maples testified, on cross-examination, as follows: "At the time I talked to Mr. Taylor I told him they were there, and Jim Hugh Moss came in the store and inquired about a sack of flour, and left in the car going towards his home; that's all. That's all I did tell him." Counsel for the defendant then propounded to the witness this question: "When did you first add what you have told about him trying to get a pistol and wanting you to come down in Georgia?" The solicitor-general said, "He has been over that." The court said to counsel for the defendant, "You have been over that." Counsel for the defendant said, "I asked him who he first told that to. Who did you first tell that to?" The court then said to the witness, "Tell him, if you remember, and if you don't remember." The witness answered: "I don't remember who I told it to." The defendant assigns error upon the above action and statements of the trial judge, on the grounds, (a) that it was a denial to the defendant of the right of a thorough and sifting cross-examination; (b) that the interruption of counsel for the defendant by the court tended to minimize the effect of the cross-examination; and (c) that the language, "Tell him, if you remember, and if you don't remember," was a suggestion to the witness of the answer he should make to the question. The action of the court was not erroneous for any of the reasons assigned.

12.   The defendant asserts that the court erred in permitting Mont Howell, a witness for the State, to testify, over her objection, that he always had some money in his house. Counsel for the defendant objected to the admission of this testimony, on the ground that there was no evidence that any of the defendants knew that this witness kept money in his house. The court inquired of the solicitor-general if he proposed to show any circumstances by which they knew it. The solicitor-general replied that he expected to show by circumstances that this defendant lived up there, that the

witness kept money in his house all the time, that this was known in the community while the defendant lived up there, and was known by all of his neighbors. The court then permitted the witness to answer the question. Movant assigns error upon this ruling, upon the grounds, (a) that there is nothing to show that the defendant or her codefendants were present that night; (b) that even if they had been present, there was no evidence that they knew that this witness kept any money on his person or in his house; and (c) that there was no effort on the part of the person who was at the house of the witness that night to get any money or rob the witness. There being evidence that the witness generally kept money upon his person and in his house, that this was generally known in the neighborhood, that the defendant had lived in the neighborhood, that her codefendant went to the home of the witness on the occasion testified about, and there being evidence from which the jury might draw the inference that all the defendants on this occasion were at or near his home, and that their purpose was to rob the witness, the court did not err in admitting this testimony.

13. The defendant asserts that the court erred in permitting Mrs. Osborn, a witness for the State, to testify, over her objection, as follows: "Before Mr. Osborn was killed he had a good deal of cotton on hand; he had something like twenty bales, I don't know how many; something like that. He had been holding that cotton. He had sold this cotton shortly before he was killed, he sold the cotton, part of it that week or the week before. I think it was the week before he was killed. I won't say positively when he sold part of it. The sawmills, Hargess Lumber Company, stayed there nearly two years in that country. During the time they were there, Mr. Osborn cashed a good many checks of the people that worked at these mills." The defendant objected to the admission of this testimony, upon the ground that it was irrelevant and incompetent. The court did not err in admitting this testimony. *Thompson* v. *State*, supra.

14. The defendant insists that the court erred in questioning N. W. Puckett, a witness for the defendant, as follows: Q. "You say you carried the milk there; what time of night?" A. "I would leave home at ten o'clock, had thirty minutes to get ready for the job, it was somewhere between ten and ten-thirty when I was there." Q. "You wake them up every night?" A. "Yes sir." Q. "Every

night you went there?" A. "Every night I left milk I waked them up." Q. "How would you know they were not there?" A. "When I went by all the time, turned the curve, I could always see the car there, it was always sitting right on the side of the house; they were on the main road east of the road; and when this car was there I would know there would be somebody there. I would drive up and leave milk." Q. "What did you wake them up for if the car was there and you knew by the car?" A. "That was in August." Counsel for the defendant then addressed the court as follows: "Your honor please, we object to the court questioning this witness in that manner, as it intimates an opinion as to the credibility of this witness." The court then said: "I overrule your objection." The court then proceeded to question the witness as follows: Q. "Now, why did you say you did that?" A. "The milk would spoil if it set out there four or five hours in the hot weather. . . They always wanted to put it in the ice box when I left it." Q. "And you then woke them up each night you left milk?" A. "Yes sir, each night I left the milk I woke them up." The defendant assigns error on the ground that the court's manner of questioning the witness was such as to impeach his credibility, and to intimate to the jury that the witness was unworthy of belief. This assignment of error is without merit.

15. S. J. Maples, a witness for the State, on direct-examination testified as follows: "Jim Hugh Moss asked me what kind of a gun I had. I said 45 automatic. He asked me if I would swap with him for his gun. He said he had a gun. I don't know whether it was a 32 or a 38, what caliber it was; he was stuttering and I could not understand very plain whether it was a 32 or 38. I said, 'What do you want with it?' He said he wanted to take a trip; he said, 'How about taking me to Georgia to-night?' I said, 'I can't go down there,' and he said, 'I will give you twenty-five dollars to take me to Georgia.' I said, 'Why don't you go in the car you are in out there?' He says, 'I don't want that woman to know I am going.' He says, 'I want you to take me and follow them down there and bring me back before daylight. Follow them down there and bring me back, to follow Cliff and the woman down there.' He never said whereabouts in Georgia; just said Georgia." Counsel for the defendant moved to exclude this evidence, upon the ground that this took place prior to any alleged conspiracy. This

assignment of error is without merit, for the reasons assigned in paragraph 9 of this opinion.

16. The defendant contends that the court erred in permitting J. B. Butler, a witness for the State, to testify, over her objection, as follows: "I got a gun from the deputy sheriff; he got a gun in the room. Cliff Thompson admitted that was his gun, said it was his." The defendant objected that this testimony was irrelevant, incompetent, and hearsay. If this evidence was inadmissible for any reason assigned, it does not require the grant of a new trial.

17. The defendant insists that the court erred in permitting Mrs. Osborn, who was sworn as a witness for the State, to testify as follows: "When I called Coleman Osborn he said, 'That is the same white man and negro that was here Wednesday night.'" The defendant objected to the admission of this testimony, upon the ground that it was an expression of opinion, and because it was immaterial, irrelevant, and incompetent to connect either of the defendants with the parties that were there on Wednesday night. The court did not err in admitting this testimony, the same being a part of the res gestæ. *Thompson* v. *State,* supra.

18. The verdict is supported by the evidence.

*Judgment affirmed. All the Justices concur, except*

RUSSELL, C. J., and GILBERT, J., dissenting. We dissent from the judgment in this case, because we are of the opinion that the evidence introduced by the prosecution did not authorize a verdict of guilty.