FINDLEY *v.* THE STATE.

1. A prima facie case is all that is necessary to carry dying declarations to the jury. When this has been made out, the declarations are admitted, and the ultimate determination as to whether or not the person making them was in articulo mortis and realized that death was impending is for the jury.

2. The charge of the court complained of on the subject of dying declarations and when they may be considered by the jury was not subject to the objection made to it.

3. Under the facts of this case the court erred in not giving in charge the law of mutual combat, or mutual intent to fight.

4. While mere words, threats, menaces, or contemptuous gestures will not constitute "equivalent circumstances," within the meaning of the Penal Code, § 65, which will reduce murder to manslaughter, yet what circumstances will .present this equivalence and justify the excitement of passion and exclude all idea of deliberation or malice the law does not specifically declare. It furnishes a standard, and leaves the jury in each case to make the comparison and determine whether the special facts of the case before them come up to that standard or not. There was, therefore, no error in omitting to charge that certain acts other than those referred to in the Penal Code would constitute "equivalent circumstances."

Argued April 17,—Decided May 16, 1906.

Indictment for murder. Before Judge Lewis. Greene superior court. March 7, 1906.

Findley was indicted for the offense of murder, alleged to have been committed upon James Bradshaw with a pistol. The evidence showed, in brief, as follows: The accused went to a house on the place of the deceased and caught his (the defendant's) son, a boy about fifteen years old, who was there, by the collar and told him to come on home, and asked him why he hadn't been home. The deceased told the accused that he had hired the boy and he did not "reckon" the latter would go unless the accused got him by law. The accused said he "reckoned" he would, and that the law didn't have anything to do with his son, that he thought he had a right to carry him. The deceased replied that the accused would have to go to law before he could get the boy. He struck the accused with his fist. A person who was present advised the accused to turn the boy loose. The accused said, "I am going on home. I am not going to have any fuss on your side." The deceased replied that he had better go, and the accused said, "I am going." The deceased struck him again, and he went on. The deceased acted as

if he were going to get a rock from the ground, but the witness caught hold of him and advised him not to do it. The accused told the deceased that if he (the deceased) would come out into the road he (the accused) would kill him. The deceased asked a person near by to lend him a gun, but he did not get it. The accused said, "If you come out here in the road I will kill you." A witness who narrated these facts then added, "And the last word I heard Mr. Bradshaw (the deceased) say was, 'I am not going to;' and about that time the pistol began to shoot." When the deceased made this statement "he had not got to the road." In another part of his testimony the witness said that it was not more than two or three minutes from the time the deceased struck the accused the second time until the latter commenced shooting. "Immediately after Mr. Bradshaw said, 'I am not coming there,' the shooting began." When the accused made the statement as to the deceased coming out in the road, the witness supposed he meant the "big road." The deceased did not have to go out into that road to reach his house. The accused did have to get into it to reach his house. The witness also thought that the accused and the deceased were both in the road leading from the house of the deceased to the public road. The accused shot once, then waited a second, then shot four or five times. He then left. Later in the night he returned to the place where the deceased was lying, but not then dead. A witness heard the deceased say, "There is no need of that, uncle Eli." The accused answered, "I thought you were dead. You haven't treated me right." The deceased was on the edge of the public road when he was killed. At another time the same witness said that the deceased was in the public road when he was killed. He was going towards the defendant's house. In describing the wounds found upon him, the witness said, "I saw two wounds in the side, one in the stomach, and some kind of scar or shot on the head. His face looked like it was scratched. His forehead looked like he had been struck with something, may be a rock." On re-direct examination the witness said that when the accused said, "If you come out in the road, I will kill you," the deceased said, "That is all right; you can kill me if you want to;" and the accused went on. When he had gone a short distance he said, "Don't come out in the road on me. If you do, I will kill you." The witness added, "About that time Mr. Bradshaw got

about even with my brothers." It was then that he called for a gun but did not get it. He was shot on Wednesday night, and died the following Friday. The doctor came to dress his wounds about ten or eleven o'clock Friday morning. When the shooting began, the parties were about ten or fifteen feet apart. The accused lived about six hundred yards distant from the place where the homicide occurred, and not on the property of the deceased. On Thursday the deceased stated that he had been shot, and was going to die. He said that the accused shot him for nothing. The same witness added that the deceased told him that the accused came back with his gun and said that he had come to finish the deceased, and the latter begged him not to do so. The defendant introduced no evidence, but made a statement. The jury found him guilty of murder. He moved for a new trial on the general grounds and: (1) Because the court admitted evidence of the dying declarations of the deceased. This evidence was objected to on several grounds which made 'substantially the points that it did not appear that the declarations were made while the declarant was in a dying condition or was conscious of the fact, or of impending death, or that the fear of death, if any, continued after the declarations were made until the time of death, and that the hope of life did not return after such declarations were made. (2) Because the court charged as follows: "There is certain testimony before you touching certain declarations made by the deceased prior to his death, claimed by the State to be dying declarations. It is proper that I should call your attention as to what constitutes dying declarations; in order to make this evidence at all for your consideration, you must be satisfied beyond a reasonable doubt that these declarations were made while the person was in a dying condition, and you must be satisfied further that these declarations were made by the person knowing at the time he was in a dying condition. If those conditions exist, they become what the law terms dying declarations; and if any declarations were made under such conditions as that, it is testimony to be considered with all the other testimony in the case. If either one of these did not exist, it would not be testimony to be considered at all." The objections to this charge were: (a) It was too general, and did not inform the jury that dying declarations should be weighed with the greatest deliberation and scanned closely; (b) it did not inform them that

if they found from the evidence that the slightest hope of recovery existed in the mind of the deceased at the time of the declarations, they should not be considered; (c) it did not state that a mere belief in or fear of death was not sufficient to make such declarations evidence; (d) it did not state that all hope of recovery must have been abandoned, and that a belief of the declarant that he would ultimately die would not suffice; (e) it did not state that the declarant must be actually in extremis—in articulo mortis, and believe himself to be so; (f) it did not instruct the jury that declarations not relating to the cause of the death or to circumstances attending the transaction, or declarations relating merely to matters of opinion could not be considered; (g) it did not caution the jury that passion, hatred, and feelings of like nature, and inaccuracy of ideas, and confusion attendant upon approaching dissolution are likely to color the declarant's utterances.    (3) Because the court erred in not charging the jury concerning the law of mutual intention to fight, movant contending that the facts required it. (4) Because the court failed to state in the charge to the jury what equivalent circumstances, as set forth in the Penal Code, § 65, would reduce the crime from murder to voluntary manslaughter; it being contended that this principle of law, under the facts of the case, should have been elucidated by the court, as the evidence showed that the deceased was endeavoring by violence to keep the minor son of defendant away from the custody and control of defendant. The court overruled the motion for a new trial, and the defendant excepted.

*James B. & Noel P. Park* and *Miles W. Lewis,* for plaintiff in error. *John C. Hart, attorney-general,* and *Joseph E. Pottle, solicitor-general,* contra.

LUMPKIN, J. (After stating the facts.)

1. The evidence made a sufficient prima facie case to carry the dying declarations to the jury. When this is done, they may be admitted and the jury left to determine whether in fact the person making them was in articulo mortis and realized that death was impending. *Anderson* v. *State,* 122 *Ga.* 161. Whether any part of the declarations was objectionable on other grounds or not, they were not subject to the objections made.

2. The charge of the court complained of was quite as favorable to the accused as he could have expected. It stated to the jury,

as to testimony touching what were claimed to be dying declarations, that in order to make this evidence at all for their consideration they must be satisfied *beyond a reasonable doubt* that the declarations were made while the person making them was in a dying condition; and that he knew at the time that he was in such condition; that if either one of these conditions did not exist, the declarations would not be testimony to be considered at all; but if both existed, they would become what the law terms dying declarations, and if made under such conditions, "it is testimony to be considered with all the other testimony in the case." This charge is quite different from that discussed in the case of *Mitchell* v. *State*, 71 *Ga.* 148, where the court admitted dying declarations, saying that he would instruct the jury as to their weight, and where he charged that if the declarant was conscious of the fact that he had been wounded and that he would die from the wound, and if while in that condition he made a statement as to who wounded him, "then you may consider that statement as though it had been given in under oath on the trial of the case."

3. The evidence in this case involved the question of whether or not there was such a mutual combat at the time of the homicide as to reduce the killing from murder to manslaughter. The court omitted entirely any reference to that subject, though charging generally on the subject of manslaughter. In *Ray* v. *State*, 15 *Ga.* 223, it was said: "Our law requires that there should be some assault, by the person killed, upon the person killing; but evidence of such assault may be found in a mutual intention to fight, and in the fact of an approach by the decedent to the prisoner, in furtherance of this design, when it was not necessary for him to do so in self-defense." Mutual blows are not always necessary to make mutual combat. *Tate* v. *State*, 46 *Ga.* 157; *Gresham* v. *Equitable Ins. Co.*, 87 *Ga.* 497. See also *McMillan* v. *State*, 35 *Ga.* 60; *Trice* v. *State*, 89. *Ga.* 742; *Gann* v. *State*, 30 *Ga.* 346; 7 Michie's Dig. Ga. Rep. 76-77; 2 Roscoe's Cr. Ev. *724. Where the law of mutual combat is essentially for consideration in the case, the charge should submit it to the jury. *Waller* v. *State*, 100 *Ga.* 320.

4. The complaint that the court did not set forth in his charge what would constitute "equivalent circumstances," in the meaning of the Penal Code, §65, is not well taken. "What circumstances will present this equivalence, and justify the excitement of passion,

and exclude all idea of deliberation or malice, the law does not undertake to say; it furnishes a standard, and leaves the jury in each case to make the comparison, and determine whether the special facts of the case before them come up to that standard or not." *Mack* v. *State, 63 Ga. 693, 696.* In *Edwards* v. *State, 53 Ga. 428,* it was held, that the equivalent circumstances referred to in the statute do not include words, threats, menaces, and contemptuous gestures. *Sumner* v. *State, 109 Ga. 142, 143.*

*Judgment reversed. All the Justices concur.*