### . 623. SAPP *v.* THE STATE.

1. "If upon a sudden quarrel the parties fight upon the spot, or presently agree and fetch their weapons and fight, and one of them is killed, such killing is voluntary manslaughter, no matter who strikes the first blow." *Gann* v. *State*, 30 *Ga.* 67. A mutual intention to fight need not be proved directly, but may be inferred by the jury from the conduct of the parties.

2. There being evidence in the record upon which the verdict can legally rest, this court has no power to grant a new trial.

Conviction of manslaughter, from Screven superior court— Judge Rawlings. May 27, 1907.

Submitted July 18,—Decided August 8, 1907.

*E. K. Overstreet,* for plaintiff in error.

*Alfred Herrington, solicitor-general, H. A. Boykin,* contra.

POWELL, J. The accused shot at one Brannen; and the shot straying struck a boy standing by and killed him. It is conceded that the offense is the same as if Brannen had been killed instead of the boy; and, indeed, this seems to be the law. A verdict of guilty of voluntary manslaughter was rendered; and the insistence through the present writ of error is that this verdict is contrary to law and without evidence to support it. It appears from

29

the record, that, a day or so prior to the homicide, Brannen had ordered one of the defendant's boys out of a mill operated by Brannen's father. On the day of the fatal rencounter the wife of the defendant came to the store near by the mill and remonstrated with Brannen for his having ordered her boy out of the mill, and he made her leave the store. We will give the account of the further details of the transaction leading up to the shooting, in Brannen's words, as taken from the record: "I looked out and about half way between the storehouse and the mill, which was about fifty yards distance, and I saw this man Sapp and his boy; he was sitting on a work-bench, and I saw that he had a gun. I am pretty sure that he didn't have the gun in his hand, but as well as I can remember he and his boy were sitting on the work-bench, and the gun was leaning against an oak tree about twenty or thirty feet from them; and I reasoned out in my own mind, those negroes had been working there, but were not working there that day, and I had just decided that they had come there to attack me. So I picked up my father's gun that was left in the corner of the store, and I cocked it; it looked as if I was going to have trouble. Mr. Andrews says, 'What are you going to do, Harry?' and I says 'I guess I had better prepare myself to defend myself,' and I started on, and he says, 'No, put the gun down,' and I took the gun and set it down there still cocked, and left it there sitting in the corner and started over to my father's. When I got about half way, the negroes were still talking among themselves in a low tone of voice and looked as if they were mad, and saying what they were going to do if I didn't let their boys have the privilege of going in the mill-house, and such as that; and this Sapp spoke up—the first time that he had spoke to me—and he says, 'Here is my boy now, and he can whip you,' and he says, if I remember right, 'We can fix you,' and he says, 'There is the boy right now,' and I says, 'What have you got to do with it? Shut your damn black mouth,' and he says, 'I will see,' or words to that effect, and jumped down off the bench and run towards his gun and I noticed he was making towards the gun. I was only a few feet distance from the store and I broke and run back to the store and picked up my gun that I had left there and run out and of course the gun was already cocked and as soon as I cleared the doorway I saw from the negro's ac-

tions that he was going to shoot. I judged that he was, at least, and of course I got ready to shoot, and as soon as I did clear the doorway I did shoot one barrel, he shot also; the two guns—you couldn't distinguish one from the other. I have learned since, from the amount of shot that struck the store, that it was a very full charge at least in the gun." It further appears from the testimony of this witness that the defendant's gun was loaded with large shot. Further relevant portions of the testimony of this same witness are as follows: "I did go back to get a gun to shoot the negro. I did it to defend myself; for he was going after a gun to shoot me with. I started back to the store with the full determination of getting my gun to shoot the negro to defend myself; when I got to the door and got the gun I immediately fired, and he did too at the same time. I know that my gun didn't fire first. I know that both guns were fired so close together that you couldn't distinguish which one fired first. I claim that he was about as quick as I was. When I reached the door the gun was sitting side of the door, and I picked up the gun and fired immediately. I didn't have to go inside the store to get the gun. I just did clear the door before I fired. I had the gun to my shoulder when I fired. I don't know whether the negro had his gun to his shoulder or not. I don't know how he had his gun, because I was shooting myself; before I started back to the store he didn't have his gun in his hands, it was standing against the work-bench. When the negro first accosted me he was sitting on this work-bench, which was I should say about twenty yards from the store, and I had got very near about opposite the work-bench on my way to the mill before he spoke to me. I was about thirty feet nearer the store than he was. I didn't have to go straight. I was kinder across from the work-bench. I was about fifteen yards from the store when I turned and went back to the store. He would have had plenty of time to have shot me, but he didn't have his gun; it was leaning against the end of the work-bench, and he was sitting on the other end of it; he jumped down off the bench and started to run; he was within, I should say, twenty-five feet of his gun; he was nearer his gun than I was to the store, but I don't think it was possible for him to have got his gun and shot me before I got in the store, because he had to get down off of the bench and go to his gun and pick it up and

cock it and raise it in a shooting position; I don't know whether his gun was cocked like mine or not; it may have been; I don't know. So far as I know it wasn't cocked; he would have had to move pretty fast if he had shot me before I got back to the store, because I was moving pretty fast. The reason, one reason I know he was going for his gun, he said: 'We come here prepared for you,' and I was having the argument with him; it was an opinion of mine, a strong belief. When I started out there, Mr. Andrews requested that I leave the gun on the inside, and I left it there. I was expecting a difficulty, and only intending to defend myself. This woman had been in the store and raised this difficulty and went out there, and they were talking among themselves; and when I got a part of the way across, the defendant here says, 'we come to fix you,' and then he got down and started for his gun or started in the direction of it. I don't remember really whether the gun was leaning against the end of the work-bench or against a tree near by. When he turned and started he went in the exact direction of the gun, and I knew there wasn't anything else for him to be going for; so I went for mine, and when I shot I saw him with his gun to his face; it was just a glance, only a few seconds." The shot fired by the defendant struck the boy. The defendant by his statement set up a complete case of self-defense. There was other evidence for the State; but since, if there was any theory of the evidence by which the jury could have reached the verdict rendered (and that set out above seems to us to authorize it), we are bound to adopt it and affirm the judgment. There being no other error assigned, we do not deem it necessary to set out more than we have already done. The verdict seems to be warranted upon the theory of mutual combat; the words and conduct of the defendant as detailed above seem to us to have authorized the jury to believe that the defendant was willing to fight the matter out, and that Brannen accepted the implied challenge. "If upon a sudden quarrel the parties fight upon the spot, or presently agree and fetch their weapons and fight, and one of them is killed, such killing is voluntary manslaughter, no matter who strikes the first blow." *Gann* v. *State,* 30 *Ga.* 67, and cit. This principal case has been frequently cited by our Supreme Court in subsequent cases, and is a clearly-recognized principle of our law. It may be

true that at the time the defendant actually fired, the person at whom he shot was trying to kill him; but before this fact can be set up in justification, under the Penal Code, §73, which is applicable in cases of mutual combat, "it must appear that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given." *Stiles* v. *State,* 57 *Ga.* 188; *Heard* v. *State,* 70 *Ga.* 602. If the testimony of Brannen be true, the defendant, by rushing for a weapon, coupled with a threat and an apparent present purpose of using the weapon, became the assailant, and there is no evidence that he declined any further combat. According to the record, the parties, by their mutual preparations for the rencounter, by their quarrel, by their language expressing willingness to fight, by their simultaneous display and use of deadly weapons, made just such a case of mutual combat as is contemplated by the language used in *Gann's* case, supra.

*Judgment affirmed.*