## HARRIS *v*. THE STATE.

1. Under the ruling made in this case when it was before this court on a former review (see 149 *Ga.* 724), the court did not err in admitting as evidence the statement made by the deceased, which the State offered as a dying statement.
2. Where the law of mutual combat is essentially for consideration in the case, the charge of the court should submit it to the jury even though no written request therefor is preferred.
3. Whether the court erred in not charging the jury that " they could not consider the statement of the deceased in making their verdict, unless they found at the time of making such statement he had abandoned all hope of living," was error or not depends upon whether the court gave instructions to the jury in regard to the dying statement, and what those instructions were. The movant having failed to show what the court's instructions were upon this subject, the mere failure to charge in the language here set forth can not be adjudged to show cause for the grant of a new trial.

No. 2586. OCTOBER 14, 1921.

Indictment for murder.   Before Judge Wright.   Floyd superior court.   March 23, 1921.

*Len B. Guillebeau* and *W. H. Ennis,* for plaintiff in error.

*R. A. Denny,* attorney-general, *E. S. Taylor,* solicitor-general, *Graham Wright,* asst. atty.-gen., *J. F. Kelly, M. B. Eubanks,* and *F. W. Copeland,* contra.

BECK, P. J.   The plaintiff in error, Charlie Harris, was indicted in Floyd superior court for the offense of murder.   He was tried, convicted, and sentenced to death.   He made a motion for a new trial, upon the general grounds, and thereafter filed an amendment to this motion, alleging as further ground for a new trial that the court failed to charge the law of voluntary manslaughter as based upon the theory of mutual combat or mutual intention to fight; and also that the judge erred in not charging the jury that they could not consider a statement of the deceased, introduced in evidence by the State, as a dying declaration, unless they believed that at the time this statement was made by the deceased every hope of life with him was extinct; the plaintiff in error contending that the deceased expressed in the statement itself a hope of life, and that the judge in his charge should have submitted to the jury the question of whether or not the expression used by the deceased in his statement amounted to a hope of life.

1.   Under the ruling made in this case when it was here before (*Harris* v. *State.* 149 *Ga.* 724, 102 S. E. 159), the court did not err in admitting as evidence the statement made by the deceased, which the State offered as a dying statement.

2.   In the second ground of the motion for a new trial error is assigned upon the court's failure to charge the jury upon the law of voluntary manslaughter as based upon the theory of mutual combat or mutual intent to fight.   Whether the failure to charge upon this subject was error or not depends upon the question as to whether there was evidence from which the jury may have been authorized to find that there was mutual combat or mutual intention to fight.   In the statement of the deceased, which was introduced by the State, we find the following: "Q. Now just tell in your own way what he shot you with, and why he shot you.   A.   I wanted him to plow yesterday, and he would not plow; wanted to hire him to plow for me if he would not

plow in his own crop, and he would not do that, and he would not feed the mules; and this morning I lacked a couple of hours being done a piece of land, and he came up before breakfast to plow, I guess, and had a pistol in his bosom, and I holp him put a land slide on, and told him to go to plowing the other mule, and I would be done directly and he could have the other one also; and somebody turned the mule in the pasture, and he would not plow it. Q. What did you say to him and he to you? A. And I went up on the hill to plow, and went around and came back and told Charlie to get the other mule and to go to plowing and I would be done in a little while, and he could take both and go to plowing, and he said no, that if he could not get both then he would not plow none, and I says, ' You are working for contrariness,' and he says, ' that's a lie,' he was not, and I throwed a rock at him. Q. And then what? A. He ran his hand in his bosom and got his pistol out. Q. When he got the pistol out what did you do? A. I ran around the mule, and my pistol was in my pocket, in a corduroy coat, and I tried to get it, and I ran around the mule twice, and he kept shooting as I came around, and I begged him to quit. Q. What did you have in your hand when he shot you? A. I was trying to get my gun. Q. Was your gun on your person? A. In my pocket. Q. And you had your coat on? A. Yes. Q. Did you shoot any? A. No, I didn't shoot. Q. How many times did the negro shoot? A. And the next time he shot I dropped my pistol and he shot me through this arm, and I don't know what went with my pistol."

Isabel Spruce, a witness introduced by the defendant, testified in part as follows: " When I came out Charlie was on his knees knocking on his plow, and when Mr. Pierce got near to him I heard them talking, and I did not pay them any attention until they spoke loud, and I turned around, and when I' looked towards them Charlie was around the mule, and when he came around Mr. Pierce came around, and they both ran around the mule; one in front of the other; and Mr. Pierce grabbed at Charlie with his hand, and Charlie jumped back off him, and then Mr. Pierce throwed up his hands as if he was going to shoot, and Charlie jumped back and threw his hands up, and when Charlie threw his hands down and when he came up again

he had his gun, and Mr. Pierce had his already. There were two shots as I remember, unless they both fired at once. When I seen them they were going around the mule the last time before the shooting. Mr. Pierce was after Charlie, and when he came around the mule he made at Charlie with his hand this way. When Charlie threw up his hands I could see he did not have anything in them; he just threw his hands up this way, when he jumped back off from Mr. Pierce, with his hands out open like this; when he had his hands up like that Mr. Pierce had something in his hand, looked like he had his gun pointing at Charlie that way, and Charlie throwed his hands down, and when he came up he presented his gun, and they were talking all at the same time, but I could not understand them." On cross-examination she testified: " I did not say I didn't see the shooting. I said I heard the talking and turned around. It is true I testified that I looked around when they shot. I heard the shooting and I looked around, and they both looked like they were fixing to shoot; couldn't tell which shot first, and that's right unless they shot at the same time." And then, in answer to a question as to her testimony at the coroner's inquest, she said: " I do not remember that the question was asked me at the coroner's inquest, ' The shooting occurred at the plow where Mr. Pierce was plowing?' and that I answered, ' Yes, sir, when I looked around they both brought their hands up that way.' Charles throwed his hands up, and I said that when Mr. Pierce grabbed at Charlie and Charlie jumped back from him, they both throwed their hands up to shoot, after Charlie throwed his hands up and come down. Mr. Pierce had his already up. Q. Wasn't this question asked you on that hearing, ' Did you see a pistol in Mr. Pierce's hand?' and you answered, ' No, sir.' A. I said I couldn't tell whether it was a pistol, but he had it up like it was a pistol. I suppose I answered ' It was too far for me to see, I couldn't tell; he had a pistol, though, for they went out and got Mr. Pierce's pistol afterwards. I couldn't see the pistol from my house, and couldn't tell what either had in their hands.' " ·

Under this evidence the law of mutual combat or mutual intention to fight was involved in the case. See *Gann* v. *State,* 30 *Ga.* 67; *Findley* v. *State,* 125 *Ga.* 579, 583 (54 S. E. 106) ; *Matthews* v. *State,* 136 *Ga.* 125 (70 S. E. 1110). The law of mutual

combat being involved in the case, instructions upon that subject should have been given by the court, although no written request therefor was preferred. In the case of *Waller* v. *State*, 100 *Ga.* 320 (28 S. E. 77), it was held: "There being, on the trial of an indictment for murder, evidence which, if credible, would have warranted a finding that the slayer and the deceased, upon a sudden quarrel, each being armed with a deadly weapon, mutually engaged in a mortal combat, each using his weapon and intending to kill the other therewith, it was the duty of the judge, with or without a request, to give in charge to the jury the law of voluntary manslaughter as related to the doctrine of 'mutual combat;' and the omission to do so is cause for a new trial, where the accused was convicted of murder." In *Findley* v. *State,* supra, this court said: "The evidence in this case involved the question of whether or not there was such a mutual combat at the time of the homicide as to reduce the killing from murder to manslaughter. The court omitted entirely any reference to that subject, though charging generally on the subject of manslaughter." See also *Ray* v. *State,* 15 *Ga.* 223; *Butt* v. *State,* 150 *Ga.* 302 (103 S. E. 466). In the instant case the judge failed to charge upon the subject of voluntary manslaughter as based upon the law of mutual combat; and this was such error as requires the grant of a new trial.

3. The ruling made in headnote 3 requires no elaboration.

*Judgment reversed. All the Justices concur, except Atkinson, J., absent on account of sickness.*