HARRIS *v.* THE STATE.

No. 11707. MAY 13, 1937.

*Davis & Stephens,* for plaintiff in error.

*M. J. Yeomans, attorney-general, B. Frank Simpson, solicitor-general, O. H. Dukes,* and *B. D. Murphy,* contra.

HUTCHESON, Justice. J. B. Harris, a negro man, was indicted, together with five other negro men, Harvey Spielman, Wheel Chandler, Charlie Wilhite, Cam Rakestraw, and Lonie Burns, for the murder of Joe Culpepper, a white man, on March 21, 1936, by shooting him with a pistol or other firearm, and inflicting upon him a mortal wound. Cam Rakestraw and Lonie Burns not having been apprehended, the other four defendants pleaded not guilty. They elected to sever and to be tried separately, which was done. The trial under review in this court is that of J. B. Harris. The jury returned a verdict finding him guilty, with a recommendation, and he was sentenced to life imprisonment. He

moved for a new trial on the general grounds, and by amendment added certain special grounds. The judge overruled the motion, and the defendant excepted. It is urged that the evidence is insufficient to authorize the defendant's conviction of murder, either as one of the perpetrators of the homicide of Culpepper or as a principal in the second degree because of conspiracy, or because the defendant aided and abetted therein. We have made a careful and minute examination and study of the evidence before the court and jury in this case, which was substantially as follows:

Raymond Culpepper, a brother of the deceased, testified in substance as follows: On March 21, 1936, the deceased was shot six times with a pistol, which resulted in his death. On this day the deceased and the witness brought a load of "scrap cotton" to the City of Jefferson, in a two-horse wagon, arriving there about noon. Ernest Sorrell was with them. They went first to the gin and sold the cotton. They then came back to town "around behind Mobley's Store," and there was a crowd of negroes standing in the road or street. Whereupon the mules pulling the wagon shied at the negroes, and some of the negroes "said something sort of sassy." They used a "fractious tone of voice to" witness and his brother, "like they wanted to get raw about something," and witness and his brother jumped out of the wagon and went back to where the negroes were. The negroes were angry "about the mules shying and running close" to one of them or something. "He didn't like it, he wanted to get mad about it. *I couldn't say I had ever seen any of those niggers there before. I have not been able to identify any of them that was there since. I seen some niggers later that day. I don't know whether it was the ones down there or not. These were the only negroes any of us had any conversation of any kind with that day while we were in Jefferson.*" (Italics ours.) On the way out of town, some hour or more later, witness, the deceased, and Sorrell, together with another man named Norville Gee, were together and proceeding by the "calaboose" and into Main Street, and as they turned into this street, a "bunch of niggers come down that way and met us in an A Model Ford." On the way "up the road we saw what appeared to be this same car loaded with these same niggers again." They were headed in the same direction, and passed this wagon. The car was full of negroes. Witness and the others kept along the

road and saw this car again at "Mr. Drake's filling station," about one mile from town, and just as they got in sight of the filling-station this car drove off. Witness and the others did not stop at the filling-station on that trip home, and when they had passed it and reached a point further along the road, about a half mile from the filling-station, "at the old rock-crusher place," where there was a high bank on each side of the road, witness saw this car of negroes again. Witness stated: "The first thing I noticed when we came in sight of this car that was on out there in the road. The car was as far out on the right of the road as it could get, headed up the road, and six niggers was standing on the outside of it. I have seen the same niggers since; this one over here [indicating the defendant] and that one back yonder were there. When I came in sight they were not doing anything to any tire or any part of the automobile that I noticed; they was just standing there in the road, looked to me like. I couldn't tell which way they were facing; they were just standing wadded up in the road. They were facing us when we got up close to them or right even with them. When we got there the little short yellow nigger had his hand in his pocket, and he said, 'Who in the hell was that wolfing down there?' and he come out with his pistol and went to shooting us; and when he done that the mules started to run, and there was several more shots fired. There was some twenty-five or thirty shots in all fired, and may be more than that." The shooting resulted in the witness and Sorrell being wounded; and the deceased was hit six times, and died. When they got up the road a good distance, the shooting stopped. "The little short negro was the first one that went to shooting, and by the time he shot they was all ready and went to shooting too. There was four or five of them shooting; you couldn't count the shots, they were firing so fast." "The little short yellow nigger is the only one that I seen shoot; there was more than that shot, but I won't say which one done the shooting. The defendant . . was not the one that started the shooting." Witness and the others had had something to drink on their way to town that morning, a pint of whisky which they drank at the filling-station. As to meeting the car of negroes, this witness further testified: "We met a car just as we turned into Main Street; they come off the main road, and we went up the road, and they went that way. It

was an A Model Ford, closed car, but I don't know if it was a two-door or four-door. We went on out the Gainesville road towards home, and saw another car" right at the edge of town where the paving stopped. "There was a bunch of niggers in the car, I didn't know none of them. I thought it was the same car I saw down here, I wouldn't swear it was; it looked to be the same car. The one we passed out by Dr. Bennett's was just an A Model closed Ford automobile. I don't know who was in the car. They went on out the road, and we went on towards home; there was no trouble there. When we got about in sight of Drake's filling-station I saw an automobile leave; it was niggers. Hadn't none passed us but this car, and it was headed up the road; this was the third time I had seen the car. I seen one on the side of the road at the old rock-crusher place. . . When we drove up I saw six niggers standing around there in the road, doing no more than standing there and stomping around. I was not looking for any trouble. I didn't look to see whether they had a flat tire, or was working on one or not, but there was not any of them working on a tire when I got up there. When we got about even with the car a little short yellow negro commenced shooting at us; and if every one of the tires had been flat I wouldn't have noticed it. . . When the mules began to run I went to shooting as quick as I could get my gun. Joe done the same thing. I emptied my gun, shot five times, and Joe shot three times." "I hadn't known the defendant before this occurred. I might have seen him somewhere before this occurred; I wouldn't say. When shooting like that takes place it is hard to tell about anybody."

Fred Culberson, deputy sheriff, testified in substance that he was called to look for some negroes that were said to have killed Joe Culpepper; that he went out to Jim Bell's filling station and Bell said some negroes in the kind of car described had just passed. "We could track them, because they had a tire off; and when we got up on the hill and tracked them down to a Millsaps nigger's and found them, the car was standing there in the yard, one tire was off and the other tire was flat. We got Charlie Wilhite out from under the bed in the house. Mr. Purcell and Mr. Stewart got the defendant." "Both of these niggers we found at the Millsaps nigger's house were drinking. We asked them where they had been, and they denied all about it at first, and then said

they had been to town. The defendant and Charlie Wilhite were together, and they said they hadn't been up there; and we asked them who was with them, and they wouldn't tell us, and we asked them who the other niggers was that run off from up there, and they didn't know that. Wilhite done the talking. He was not doing much talking. Later Wilhite said Spielman and Chandler and them was in the car. Wilhite and defendant never denied being in town; they denied being up there where the shooting took place. They first denied anybody being with them; then they told about Spielman and Chandler. It was after Mr. Purcell hit them over the head that they told about the others being in the car."

Ernest Sorrell testified substantially as did Raymond Culpepper. As to the occurrence with the negroes in Jefferson, he said: "After we turned into the street . . . there was a whole bunch of niggers down there, and two stood kind of out in the road; the mules was skiddish of them; and as the mules danced by, the niggers said something another I couldn't understand; and Joe and Raymond went out the back of the wagon. I grabbed the lines and went on and took out the mules and went back down there, and Joe and Raymond and the niggers was all gone." When they started home they went "by the calaboose, and on our way into the highway met a car of niggers. It was an A Model Ford, looked like five or six niggers was in it, coming back into town. . . One of them on the front seat gritted his teeth at us, and kinda made a face, . . they did not make any signs when they passed" the wagon on the hill just out of town. The next time they saw the car was at the scene of the homicide, parked beside the road. "The niggers were kind of standing around the back end of it and other side of it. The little yellow nigger was shooting dice out in the road; he rolled them kind of back down the road just once. He picked them up, stuck them in his pocket, and we got on up there close by them, and the little yellow nigger said, 'Which one of you fellows was trying to raise hell with us down in town?' and he had his hand in his pocket and comes out shooting, and I laid down in the wagon bed. There was five or six niggers standing there. There was lots of shots made. I couldn't tell how many were shooting. The defendant and that one over yonder were up there. . . After this little yellow nigger began to shoot I couldn't tell what the others did, because I was laying

down in the wagon bed. . . They hit me once in the back, about my suspenders. . . The little yellow nigger was the only man I seen shoot. . . The defendant is not that little yellow nigger. . . We got us a drink on the way down" to town that morning, ".and took a drink before we got here." In testifying about the shooting he further said "When they got the mules stopped, I saw Joe's pistol lying back down there in the road. The car was standing there in the cut, and when I picked up the gun they was turning around. I didn't pay no attention to whether they backed up before they turned around or not. I just picked up the gun, and they came around that way."

Jim Bell testified that he operated a filling-station just beyond the river on the Winder-Jefferson highway. "I didn't go with the officers in search of the defendant. I heard the defendant make a statement freely and voluntarily. Mr. Purcell and Fred came back down by 'his place' after they got the defendant and those other boys, . . and the defendant said he was on the back seat, and said something back to Mr. Purcell, and Mr. Purcell hit him. He just told him first before he hit him that he was on the back seat and the other boy was on the front seat. Mr. Purcell and Fred asked my father how many was in the car, .and he said, 'I couldn't tell exactly; there was some on the front seat and some on the back seat,' and the defendant opened up and said he was on the back seat; and that was when Mr. Purcell hit him."

Norville Gee testified to substantially the same facts as the other witnesses who were occupants of the wagon, as to the trip out of town, meeting and passing the car of negroes, and the happenings at the place of the homicide. He said that in going up the highway, "I noticed a particular car pass us right the other side of the cement out here. It was a Ford of some kind, occupied by some niggers, approximately five or six. . . In going up the road we saw this car next where the shooting occurred up there in the highway. I didn't see them there at Drake's filling-station. . . I seen the six niggers there in the highway. Before we got even with them I didn't see them doing anything in the way of repairing the car or fixing the tires. Just as we got even with them this little yellow nigger walked out and fired, and when the first shot fired I jumped out of the back end of the wagon. Then it was just like popcorn, them shooting, and the next thing three

of them turned on me and said, 'kill that son of a bitch and we will have them all.' . . I couldn't say . . whether they shot anybody. At least four or five of them began to shoot. The defendant was present. I couldn't say positively whether I saw him do anything or not; but they all must ashot; he had a gun. . . They downed all the boys in the wagon, and then three of them turned around on me. The other three were just huddled up there together. . . The defendant on trial was not one of the three that threw guns on me; he was behind them at that time. After they quit shooting they jumped in the car, wheeled around behind me, and come back towards Jefferson. They had no flat tire then. . . All six of the niggers got in this car, turned around and started back. . . When we got up there to this spot I couldn't say positive that this defendant done anything, but he was just as deep in the mud as the rest of them was in the mire. He was at the side of the car, just standing there. He did not say anything to me or do anything to me. I couldn't say positive he done anything. I wouldn't say positive I saw him do anything. I'm most shore he had a gun. I'll swear to this jury he had one; yes, and I believe my conscience will be clear. Those niggers were shooting. . . I said positive there was four or five shooting." The witness testified that he never said, on the trial of two of the other defendants named, that the defendant "drawed a gun on me." "Q. Well you didn't see him shoot any gun? A. Well, he had a gun, a pistol. . . I couldn't swear he shot. I do not know what he did. He was just standing there. I am not positive as to what he did do."

L. N. Stewart, a Jefferson policeman testified that he went with other officers in search of these negroes, and that he saw the defendant "coming around from some little building, out at the barn. I called Purcell, and we got him and searched him; and when I asked him if he had been in town, he denied being in town that evening to start with, and . . finally admitted being in town, but he didn't know anything about the trouble." Witness testified that defendant at first persisted in saying that there were only two in the car, and finally stated the truth when Mr. Purcell hit him with a blackjack. He testified that defendant said, "I was on the back seat, and Wilhite was driving." Witness stated that he had started from the house where the car was parked to-

wards the outbuildings, looking for the defendant, and first saw the defendant coming towards the house.

Eugene Huff, a white boy thirteen years old, testified that he lived with his father near the scene of the homicide; that he heard shooting, many shots, and in about five or ten minutes an automobile stopped near his home, and there were lots of negroes in the car; that they got out, and part of them picked up the back end of the car and pulled a tire off; that four of them got back in the car, and two left the car and went out across the field; and that the shots he heard were going just as fast as a person could pull a trigger.

F. S. Drake testified that he operated a filling-station about half a mile of where the killing occurred, that he could not see it from his place, and that on the day of the homicide "some niggers stopped at my place of business. . . They rolled up in a car and wanted two gallons of gas. . . . Lonie Burns and Wheel Chandler come on in the house to get a bill changed, and I throwed down two pennies, a dime, and half a dollar, and Lonie Burns said, 'Cap, I don't want the pennies; they are bad luck to me.' I said 'Well, what you want?' and he said, 'Give me two Baby Ruths.' I give him the two Baby Ruths, and he said, 'Here Wheel, take one,' and Wheel took it. . . The Burns nigger got over at the showcase, . . looking down the road through the window there, and he stood there for a few minutes, and then turned to Wheel and said, 'Wheel, you going to stick to me?' and Wheel said, 'I'll stick to you until hell freezes over,' and he said, 'Well, let's go.' They went out to the car and went around the front of the car to the other side, and stood there and talked a good little bit, and they got in the car and drove off up the road." This witness testified that no one was in the store but the two negroes named; that from the window they had a straight view of the road about 250 yards; that he was watching out the window at the time, and saw the wagon with the deceased and the others coming about 75 yards down the road; and that in about 30 minutes four of the negroes came back in "an old Model A Ford touring-car with the left rear tire off, and it bumpity-bumpity bump when they come down the road. . . These six negroes drove up to my station [the first time] in an old gray looking A Model Ford touring-car." The witness again stated that none

of them got out but the two negroes named, and that the defendant was in the front seat; also that the Culpepper boys drank about a pint of whisky at his place on their way to town.

Dr. J. S. Stovall testified as to the death of deceased on March 21, 1936, from gunshot wounds. The defendant made no statement in his own behalf.

■ The court should have charged the jury, whether requested or not, on the subject of manslaughter while engaged in mutual combat. See Code, § 26-1007. There was evidence to show that both groups were armed, that they had been engaged in a previous quarrel arousing their passions, and that subsequently they met in the road, not necessarily by design of the negroes, at least of this defendant, but where they were engaged in shooting craps, and one of the negroes, the short yellow one, precipitated the encounter by making a belligerent and profane inquiry of the group of whites, and drew his gun and commenced to shoot, and that they all, negroes and whites, engaged in a general shooting scrape. In such a situation, who fires the first shot is not necessarily material. Gann v. State, 30 Ga. 67; Sapp v. State, 2 Ga. App. 449 (58 S. E. 667); Harris v. State, 2 Ga. App. 487 (58 S. E. 680). "A mutual intention to fight need not be proved directly, but may be inferred by the jury from the conduct of the parties." Sapp v. State, supra. There were sufficient facts and circumstances in this record to show a mutual willingness to fight from aroused passions. In such a case it is reversible error to fail to charge on the theory of voluntary manslaughter as related to mutual combat or mutual intention to fight, from which the jury might find the defendant guilty of manslaughter. Butt v. State, 150 Ga. 302 (103 S. E. 466); Little v. State, 150 Ga. 728 (105 S. E. 359); Findley v. State, 125 Ga. 579, 583 (54 S. E. 106); Williams v. State, 125 Ga. 302 (54 S. E. 108); Higgs v. State, 148 Ga. 136 (95 S. E. 994); Hart v. State, 135 Ga. 356 (69 S. E. 530); Walker v. State, 100 Ga. 320 (28 S. E. 77). Where there are any facts or circumstances tending to show mutual combat or mutual intention to fight, the court should give this law in charge. Cash v. State, 18 Ga. App. 486 (89 S. E. 603). Even though the accused deliberately sought mutual combat with deadly weapon, the jury might find him guilty of manslaughter if he killed under excitement rather than deliberately. See Dickens v. State, 137 Ga.

523, 529 (73 S. E. 826), and cit.; *Roberts* v. *State,* 65 *Ga.* 430. The evidence in this case required the court to charge in regard to the law of mutual combat, both as to murder and voluntary manslaughter. *Buchanan* v. *State,* 153 *Ga.* 866 (113 S. E. 87). Mutual combat exists where there is a fight and both parties are willing to fight; and under all the facts and circumstances in the case the court should have given this law in charge, whether requested or not, and a new trial will be granted on account of the failure of the court so to charge. *Harris* v. *State,* 152 *Ga.* 199 (108 S. E. 781); *Slocumb* v. *State,* 157 *Ga.* 131, 132 (121 S. E. 116); *Eich* v. *State,* 169 *Ga.* 425, 429 (150 S. E. 579). Of course, if there is malice shown, a verdict finding the defendant guilty of murder would be authorized; but if two of the defendants had malice, and this defendant did not, he could not be found guilty of murder, but should have been found guilty of manslaughter. *Shepherd* v. *State,* 150 *Ga.* 799 (105 S. E. 485); *Cargile* v. *State,* 137 *Ga.* 775 (74 S. E. 621); *Freeman* v. *State,* 70 *Ga.* 736.

■ The plaintiff in error assigns error upon the admission, over his objection, of evidence regarding "the difficulty at the negro restaurant in Jefferson between the two Culpeppers and the unnamed negroes." This testimony was admissible as tending to show bad feeling between the two groups. The contention that there was no evidence and no circumstance at all from which the jury could find that the accused now on trial was connected with this "bunch of negroes" is not well taken. The statement of the "little yellow negro," who seems without dispute to have been an actual perpetrator of the homicide and who has not been apprehended, made when the wagon in which the deceased and the other white men were riding came abreast of where the negroes were in the highway, as to which one of the white men had been "raising hell" or "wolfing" with the negroes back in town that morning, was a sufficient circumstance, taken in connection with all the evidence, facts, and circumstances in the record in this case, to connect each of the negroes comprising the group in the highway at the scene of the homicide with the negroes with whom the deceased and his brother had had the previous difficulty that same morning in the Town of Jefferson. See *Jones* v. *State,* 63 *Ga.* 395, 399; *Thompson* v. *State,* 166 *Ga.* 758, 777 (144 S. E. 301); *Ledbetter* v. *State,* 51 *Ga. App.* 560 (181 S. E. 120). Likewise a

new trial is not required on account of the admission of evidence as to the car-load of negroes passing and repassing the wagon, although there was no direct testimony that the defendant on trial was in the automobile; except when the car-load of negroes drove up to Drake's filling-station just before the homicide. Testimony concerning the presence of this defendant at the place where the actual shooting took place was admissible. He was shown by direct testimony to have been present, and it was a jury question as to whether there were sufficient facts and circumstances in the evidence to connect him with the commission of the crime as a conspirator, not actually doing the shooting, but aiding and abetting by his presence.

Under the evidence there was no error in the charge of the court on the subject of conspiracy. Conspiracy may be shown by acts and conduct as well as by direct proof or express agreement. It may be shown by circumstantial evidence. It may be established by inference, as a deduction from conduct which discloses a common design. Code, § 26-1901; *Bolton* v. *State*, 21 *Ga. App.* 184 (94 S. E. 95) ; *Durham* v. *State*, 41 *Ga. App.* 421 (153 S. E. 222) ; *Chance* v. *State*, 156 *Ga.* 428 (119 S. E. 303) ; *Tanner* v. *State*, 161 *Ga.* 193 (130 S. E. 64).

There was no error in the failure of the court to charge on the law of circumstantial evidence, in the absence of an appropriate written request therefor. There was both circumstantial and direct proof in this case. *Brown* v. *State*, 178 *Ga.* 772 (174 S. E. 536) ; *Haden* v. *State*, 176 *Ga.* 304, 312 (168 S. E. 272) ; *McElroy* v. *State*, 125 *Ga.* 37 (53 S. E. 759). A failure to give the jury the definition of circumstantial evidence as embodied in the Code, § 38-102, will not require a new trial, where not requested.

The court did not err in admitting in evidence the conversation which occurred between Lonie Burns and Wheel Chandler, two of the defendants jointly indicted with this defendant, over the objection that it was not had in the presence of this defendant, and that there was neither proof nor circumstances from which it could reasonably be shown that he acquiesced therein or knew anything about the same. *Judgment reversed. All the Justices concur.*

RUSSELL, C. J., and ATKINSON, J., concur in the rulings stated in the headnotes, but do not concur in all that is said in the opinion.