1. The evidence supported the verdict, and the general grounds of the motion for new trial are without merit.
2. The first special ground complains of an excerpt from the charge of the court that the jury may consider flight "and similar acts" if proved, from which an inference of guilt may be drawn, but that flight is subject to explanation, and it is for the jury to decide whether or not they would draw the inference of consciousness of guilt, the complaint being that the inclusion of the words, "and similar acts," without an instruction to the jury as to what specific similar acts they were allowed to consider, was harmful and prejudicial. There is no merit in this complaint. Mack v. State, 63 Ga. 693, 696; Findley v. State, 125 Ga. 579 (4) (54 S.E. 106); 2 Wigmore on Evidence (3rd ed.), p. 111, § 276. Nor was the further criticism that the court failed to fully instruct the jury *Page 18 
as to the weight to be given the explanation by the defendant, meritorious.
3. The second special ground excepts to the charge on implied malice, upon the ground that it was inapplicable, since there was no evidence showing provocation and the circumstances did not show an abandoned and malignant heart. The third special ground complains of the charge that, where the defendant admits the killing, the burden is upon him to show justification unless it is shown by the State's evidence, upon the ground that it was inapplicable since the evidence shows mitigation. The fourth special ground excepts to the charge that, if the defendant did the killing in the manner alleged in the indictment, and at the time of the killing he was not threatened with serious bodily injury from the deceased, and the surrounding circumstances were not such as to justify him in believing that he was in such danger, but that he killed intentionally with malice aforethought and without justification, the jury would be authorized to find him guilty of murder, upon the ground that the charge was inapplicable, since there was no evidence showing mutual combat or that the deceased was about to commit a serious personal injury upon the defendant, and that it placed a greater burden upon the defendant than the law required of him. All of these special grounds are without merit.
4. The fifth special ground excepts to the failure to charge without request "on the law of manslaughter." Special grounds six and seven complain of the refusal of written requests to charge on manslaughter, but fail to show that such requests were made before the jury retired. These grounds are without merit, the first because too indefinite (Norris v. State, 184 Ga. 397, 191 S.E. 375); and the other two because it does not appear that they were submitted within the time required by law. Code, §§ 70-207, 81-1101; Nickerson v. Porter, 189 Ga. 671 (7 S.E.2d 231); Rogers v. Manning, 200 Ga. 844 (38 S.E.2d 724). Moreover, the evidence did not authorize a charge on manslaughter.
5. The remaining special ground complains because the jury was confined in a room where telephone communication was available to the jurors between and with parties interested in the case, and it is asserted that the said "communication" was harmful and prejudicial to the defendant. There is no merit in this ground.
Judgment affirmed. All the Justices concur, except Bell, Justice, absent on account of illness.
 No. 16202. JULY 14, 1948.
 STATEMENT OF FACTS BY DUCKWORTH, PRESIDING JUSTICE.
Wayne F. Woodruff was convicted of the murder of Myron D. Southerland, the verdict containing no recommendation of mercy. His motion for new trial as amended was overruled, and he excepted.
The body of the deceased was found in a cabin in a grove *Page 19 
in Charlton County near St. George "about a week" after July 13, the date of the alleged crime, the exact time not being shown by the evidence. A pair of glasses found with the body was identified as belonging to the deceased, who lived in Jacksonville, Florida, and a dentist of that city identified the body as being that of the deceased by an examination of the latter's teeth, the dentist's record showing that about two years previously he had made a bridge for the deceased. This bridge was found in the room of the deceased and fitted his teeth. The defendant made no report of the death of the deceased, but was arrested in El Paso, Texas, on July 21, where he at first told an officer that he knew nothing of the killing, but later "admitted he killed this fellow and how it happened — he said it was an accident." He introduced no evidence on the trial, but made a statement claiming he accidentally shot the deceased while they were target shooting at the cabin where the body of the latter was found.
The following is considered a sufficient statement of other evidence adduced: J. O. Sikes testified: "As sheriff of the county, on or about July 13 of this year, or some few days after that, I received a telephone message that a body had been found in an old abandoned house in a part of the county known as the `Bend.' When I left to go down there, I called the Seashole Funeral Home to send an ambulance down there. When the ambulance came the body was taken up and carried to Jacksonville. The body was in bad condition, having been there for about a week. There were signs that buzzards had been there. We found a pair of glasses, a glass case, fifty cents, a quarter, and two pennies. No pocketbook was found there. We empaneled a jury and held an inquest. . . There was a further investigation of the case. We left there and went to Brithwell's across the State line and talked to a Miss Johnson, who identified the glasses and case as belonging to Mr. Myron Southerland. The glasses and case were left with Mr. Whittington of the Jacksonville homicide squad after we got through talking with her. Those are the glasses and the case that she told us belonged to Myron Southerland.
Marjorie Johnson testified: "I live in Jacksonville, Florida, and had known Myron D. Southerland about two years. I knew him quite well and know that he wore glasses. The last time I *Page 20 
saw him was on July 13 about two miles south of St. George while I was visiting my sister. I was sitting at the dining room table. That's about twenty yards from the house to the road. I could see out, but he couldn't see in. I knew the car and I knew Southerland well, and he passed and I knew it was him. I was familiar with his guns and rifle, knew them pretty well. So far as I know, I don't know of but two rifles he had."
Dr. Earle G. Knocke testified: "I live in Jacksonville. . . During the month of July, 1947, I identified the body of a man. It was the body of a man named Southerland. The police department called me. . . They told me they had found a receipt of mine for $50, I believe, in his room. . . Well, fortunately I had a complete x-ray examination which was taken on the 5th of March of that year, and I had my own record my appointment book and my card, which identified everything that I did for him, and I was able to point out from the x-ray the identical teeth that existed in this man's mouth, plus a bridge which fitted exactly into the man's mouth. The bridge could be dropped over the two teeth to which it was anchored in the lower jaw and dropped into position on the teeth, and that bridge he had left at home and they found it in his room. There are no teeth of any human being that are alike, and I could go from tooth to tooth over every bit of his mouth. I would stake my oath that they were the remains of Myron D. Southerland."
L. S. Eddins testified: "I investigated an alleged murder committed in July, 1947, near St. George, Georgia. I didn't know Myron Southerland or the defendant in this case. I went to the cabin where it is alleged to have taken place. While there I heard the defendant make a voluntary statement that he was standing about middle way the cabin doing some target shooting toward this end of the cabin where the chimney used to be, and that Dickie Southerland was standing at this door, this front door, and that when he shot his pistol out this opening, the old chimney opening, he brought it back up when it fired and it recoiled and fired again, and Southerland, standing over to his left, and he heard him moan and looked around and saw him fall by the door. The door the deceased was shooting out of was in the front of the house, although there is a door on the *Page 21 
opposite side same as this door. The door and chimney openings are at 90 degrees. The defendant says he was shooting out of this chimney opening, about 90 degrees from the door in which he says Southerland was target shooting out of. In my opinion it would not be possible, if the gun had fired accidentally, for him to have shot the deceased in the manner in which he was shot unless he was accidentally pointing it at him at the same time. The deceased was to his left, immediately to his left in a 90-degree angle. This is the bullet hull from a .22 Hornet rifle. There was a .22 rifle recovered. I stated from what the defendant told us it was a 90-degree angle. He would have to be pointing it accidentally in order to accidentally shoot the man."
Henry Ephriam testified: "I was with the defendant in Jacksonville in July this year. He came up to a sandwich place that night, and we went out together along with Jack and three girls. We rode out to a place and bought some whisky. We were riding in a car that the defendant was driving. . . On the party I paid for my own drink. The defendant paid for everything else."
W. C. Wolverington testified: "I am chief detective for the City of El Paso police department. I knew the defendant from the 21st of July. . . On July 21 I arrested him in El Paso, Texas. He made a voluntary statement in my office after I told him he was being held for the murder of a party close to Jacksonville, Florida. He told me he didn't know anything about it. Before he made any other statement, my men had taken the guns off him in my office and in my presence. Those are the guns, a .22 rifle, a Savage and a scope sight and a German-make automatic pistol, about a .32 caliber. This pocketbook had between fifty and sixty dollars in it. . . After the defendant had denied any knowledge of this he made another voluntary statement. He admitted that he killed this fellow and how it happened. He said it was an accident. He said he shot him in the back of the head with this .32 German-make pistol. He didn't tell me what county he shot him in, but I believe he said it was over the county line in Georgia, but didn't make mention of the county. The defendant made two statements to me, an oral and then a written statement which I have. In the statement he made to me he said it was an accident. He said they pulled *Page 22 
into this little grove, and there was a little log cabin in this grove, and they went inside, and after they were there a little while they started to do some target practice, and Southerland was in one end of the cabin shooting out of the door with a .22 at a knot on a pine tree, and he was at the other end of the cabin shooting out of the door at a piece of dirt on a log — that he was going to shoot at that. He said he fired one shot at the log, at the dirt on the log, and this gun, the safety didn't work, he said, and the recoil came back and some way the gun went off and he heard Southerland groan and he knew then that he had shot him. I examined this pistol very carefully. It's a German-make pistol. He showed us the safety being out of order, and I looked at it but didn't make a thorough examination. I couldn't tell you whether the safety was out of order or not. He showed it to me, but I didn't try to work it to see whether it was out of order or not. The defendant signed a waiver of extradition and willingly came back to Georgia for trial."
A. L. Terber testified: "I am a gunsmith in business in Jacksonville. I surely have seen that gun before, and it belongs to Myron Southerland. There is a peculiarity about that gun. In the first place, it was a home-made action and a left-handed bolt. The barrel was made by P. O. Ackley in Trinidad, Colorado, and I fired that gun and put this scope on for him, this telescope. I also know that gun. There's a scope missing. This is the scope, a 2 1/2 K. Weaver and a Stith mount. It's Myron Southerland's gun also."
The defendant offered no evidence, but made a statement in which he set out his becoming acquainted with the deceased, and that "we were the best of friends." According to his statement, on Sunday, July 13, 1947, the deceased asked him if he "wouldn't go out with him on Sunday and we would do a little target practice again," to which the defendant assented. He called the defendant "Dick," and said "Dick asked me to bring this pistol of mine along." He narrated their travelling from Jacksonville to some location north of Folkston, Georgia; that "We went on down that road a little further and Dick saw this road turned off to the left. . . and we saw no signs there that told us to keep out of anything, so we thought maybe we could pull back in there *Page 23 
and be out of sight where no one would bother us and we could target practice if we wished. We drove back in there about a hundred yards and parked the car by an old log cabin that looked like it had been partially built and never finished. . . One end of the cabin was open where there had been a fireplace . . and two doors to the cabin, one on either side. We got out of the car there and stretched our legs for a few minutes, and since it started to rain we walked over to this log cabin to see what was in it. . . We stood there for a while watching it rain. . . Well, Dick told me it looked like our hunting was over for the day . . and we talked of other things, about shooting the rifle and the building of this cabin . . and Dick picked up the .22 rifle which was there by the open door, and he said he believed he would shoot at some knots outside the cabin on a pine tree to get a little target practice . . so I told him I thought I would try to shoot that pistol. . . Dick was standing by the open door, and he had shot once or twice out at the door. . . He told me he was shooting at some knots. I took his pistol and stepped back a little bit and looked around for something to fire it at at close range where I could see how it was going to shoot. At this open end of the cabin where I mentioned there had been a fireplace started, it was wide open, and just outside on the ground was a few old slabs or parts of logs about two or three feet . . from the edge of the cabin on the outside. On the edge of one of them was a small clump of dirt or clay or sand. . . I never examined it closely, but I thought that would make a nice target in shooting out of the cabin. I stepped back a little behind and to the left of Dick about six or eight feet, took the pistol, turned to face my target, raised the pistol up, and fired it one time. As I fired the gun recoiled, and I relaxed my grip and brings my arm back at the same time. My arm, I guess, was back half way from my body, and suddenly the gun fired again. I had relaxed my grip, and it almost went out of my hand, and that only takes a second, gentlemen. I brought the pistol back to see where I had fired. It was raining outside, and as the gun fired the second shot I heard a sound from Dick. He was in the open door taking aim outside. I thought I heard a sound from him, and he dropped the .22 rifle . . and fell back almost at my feet. . . Gentlemen, *Page 24 
you don't know what a shock that can be. . . One minute you are with a friend, your best friend, and the next minute he is laying at your feet dead. I never touched his body, I couldn't. I never touched his person. I was shocked and sick, very sick. All I could think of was to get away from there. . . I went out the door and picked up the .22 rifle where he dropped it and ran to the car." The defendant then told of driving back to Jacksonville, and "I took his little .22 rifle and this pistol into my . . room and I parked the car between 4th and 5th on Main Street. I left the keys in the switch there at that time. I didn't know what to do. I didn't have sense enough to do anything. It seemed like my mind was at one point and it wouldn't go any further. I never reported it. I didn't even think about reporting it. I couldn't think of anything except what had happened. . . Wednesday night has been mentioned here on this trial. My fiancee at that time had gone back to Orlando, Florida, to get some of her clothes for us to go to California. All I was doing was going ahead with what I had been intending, what was in my mind, for a long time. Every one knew that I had planned for a long time to go to San Francisco, go back there to work. Then Wednesday . . I went down. Dick's car was still there. I got it, went north of Jacksonville, taking this pistol. The only thing I could think of was to destroy it. I wanted to destroy it. The safety had been broken on it for a long time before then. I hadn't wanted to take it that day on account of that. I instructed in weapons in the Army. I know guns pretty well, and I never trust any of them like that. Well, this Wednesday I drove out north of Jacksonville, taking this pistol, and I fired the remaining rounds in it along the roadway and some more, I believe, in another magazine, and a car came along and I drove back . . to Jacksonville. I stopped at the Pig Whistle and one of the fellows there inquired whose car it was. I told him I had borrowed it. I didn't know what to tell anyone, what to do, what to tell. I know I never tried to sell it to him. There might have been some mention made of that, but I know I never sold it to him. We went out that night, and I had been drinking, and I drank pretty heavy. About paying for the whisky that we had, I know that I never paid for all of it because some of the crowd *Page 25 
chipped in on that. I didn't have much money. I had very little, in fact, very, very little, and we went back to Jacksonville, and it was almost morning. I let them all out and went to work. I left the car about two blocks from Merrill-Stevens Company where I worked. I quit the following Friday at noon my job. I drew $100.30 in pay. My wife and I were married. We left Jacksonville the next morning at nine o'clock on the bus, and we stopped in El Paso, Texas, and they arrested me, and I was brought back here the following Monday, a week after that. I don't know how I done anything. All I could think of was what had happened, and couldn't get sense enough to even think that straight to report it. It was an accident."
The following testimony was introduced in rebuttal by the State: E. J. Tarver testified: "I am superintendent of Fram-Florida Inc. In Jacksonville, where both Myron Southerland and Wayne Woodruff worked for me at one time as machinists. I knew Southerland well. He was accustomed to carrying considerable amounts of money with him at all times. On one occasion he came to me and asked me could I make arrangements for him to invest some money in bonds, that he had so much in his wallet he couldn't get any more in it, and he showed me he did have it at that time."
Frank Wise testified: "I work for Fram-Florida Inc. in Jacksonville, and knew Wayne Woodruff and Myron Southerland. I was present in Southerland's room when a search was made and $825 was recovered."
R. B. Whittington testified: "I am a member of the detective force of the City of Jacksonville. The time when it was alleged that Mr. Myron Southerland was killed over in Georgia, I started an investigation of that in company with Mr. Eddins, my partner, and Sheriff Sikes on July 20. I was not present in Mr. Southerland's room either time when they found the money."
L. S. Eddins, recalled, testified: "I was present when there was a search made of Mr. Southerland's room. One morning I went there and the landlady and I were looking in the dresser drawer and we found $610 in an envelope in cash. I was not there when there was $800 found there."